**ACME ROYALTY COMPANY and Brick Investment Company, Appellants,**

v.

**DIRECTOR OF REVENUE, Respondent.**

**Gore Enterprise Holdings, Inc., Appellant,**

v.

**Director of Revenue, Respondent.**

Nos. SC 84225, SC 84226.

Supreme Court of Missouri, En Banc.

Nov. 26, 2002.

Rehearing Denied Jan. 28, 2003.

Thomas C. Walsh, Juan D. Keller, John P. Barrie, B. Derek Rose, St. Louis, Edward F. Downey, Jefferson City, for Appellees.

Jeremiah W. (Jay) Nixon, Atty. Gen., James R. Layton, State Solicitor, Jefferson City, for Respondent.

Thomas C. Walsh, Juan D. Keller, John P. Barrie, B. Derek Rose, St. Louis, Edward F. Downey, Jefferson City, for Appellees in Docket No. SC84225.

Jeremiah W. (Jay) Nixon, Atty. Gen., James R. Layton, State Solicitor, Jefferson City, for Respondent in Docket No. 84226.

Michael R. Annis, Eric G. Enlow, St. Louis, Paul H. Frankel, Irwin M. Slomka, Morrison & Foerster, LLP, (Council on State Taxation) New York, for Amicus Curiae.

### Introduction

RONNIE L. WHITE, Judge.

The Director of Revenue assessed Acme Royalty Company ("ARC" or "Acme") and Brick Investment Company ("BIC"), collectively ("Appellants"), for income derived from the licensing of trademarks and trade names to a related corporation for the annual tax periods from 1992–96. Similarly, the Director assessed Gore Enterprise Holdings, Inc. ("Gore") for income derived from royalties received from a related company as a result of patents held by Gore for the tax periods from 1993–95. Acme, BIC and Gore each challenged the assessment.

The Administrative Hearing Commission ("AHC") ruled against the taxpayers, finding that they were subject to Missouri income tax. The taxpayers seek review, and the cases are consolidated for opinion.[1] Review of this case will necessarily involve the construction of the revenue laws of this state. As such this Court has exclusive jurisdiction.[2] The decision of the AHC is reversed and remanded.

## II.

Acme Royalty Company and Brick Investment Company are separate though related entities that have exclusive licensing contracts with Acme Brick Company ("ABC"), which is also a related company. ABC conducts a portion of its business in Missouri. ABC was formed in 1891, and since that time its principal business has been the manufacturing and distribution of clay bricks and other related building products. In 1968, ABC merged with Justin Boot Company, forming First Worth Company, which in turn became Justin Industries Inc. ("Justin"). Justin undertook a complete corporate reorganization in December 1991, separately incorporating its Acme brick company division under the name ABC. Justin transferred all of the assets of its brick company division to ABC; in exchange, Justin received all of the stock in ABC. Acme was also a result of Justin's reorganization. Similar to the creation of ABC, Justin transferred all of its trademarks[3] to Acme in exchange for all of the stock in Acme. Acme and ABC were incorporated in the state of Delaware.

---

1. Although the specific factual situation in each case is different, the legal question to be decided is identical. The Acme case will be the focus of this consolidated opinion, and there will be no separate discussion of the facts as they relate to Gore Holdings.

2. Mo. Const. art. V, sec. 3.

3. The trademarks in question are: "Acme"; "Acme Brick"; "Acme Brick and Design"; "Acme Brick. The Best Thing to Have Around your House"; "Acme Everset"; "Everlast"; "Acmeseal 85"; and "Thinwall Fences".

Acme subsequently entered into an exclusive licensing agreement with ABC that assigned the exclusive use of the trademarks owned by Acme to ABC. The agreement, which became effective January 1, 1992, provided that ABC would pay royalties to Acme for the use of the trademarks owned by that company. The amount of the royalty payment to ARC was to be equal to a percentage of the net sales of the licensed merchandise during each contract year.[4]

In December 1993, Acme Royalty Company Limited Partnership ("ARCLP") was formed. Acme attained a 99% limited partnership interest in ARCLP in exchange for the contribution of its trademarks. Brick Investment Company was formed for the purpose of becoming the general partner in ARCLP. BIC transferred to ARCLP the cash equivalent of one-percent of the value of the trademarks contributed by Acme in exchange for a one percent general partnership interest in ARCLP. As general partner, BIC was responsible for the day-to-day operations of ARCLP. ARCLP has held the Trademarks since its formation in 1994.

Since their formation, Acme and BIC have collectively received over $34 million in royalty payments. As a result of an audit of Missouri taxpayer ABC, the Director learned of the existence of Acme and BIC. The Director determined that Appellants were subject to Missouri income tax on their royalty income, attributing ABC's sales in Missouri to the Appellants as income from wholly within Missouri.

Pursuant to the audit of ABC, the Director issued notices of deficiency to the Appellants, assessing Missouri income tax based on Acme's receipt of royalties from ABC and on ARCLP's receipt of the royalties after its formation. Appellants protested the notices of deficiency. The Director upheld the assessments, and in its findings of fact and conclusions of law, the AHC agreed with the Director, upholding the assessments.

### III.

■ The dispositive point of this appeal is the exclusive licensing agreement between ARC and ABC, the payments that resulted, and whether those payments constitute sales in the State of Missouri attributable to the Appellants. This Court finds that Appellants had no Missouri source income because they had no sales in Missouri.[5]

■ This Court reviews the AHC's interpretation of this revenue statute *de novo*.[6] The seminal rule of statutory construction directs this Court to determine the true intent of the legislature, giving reasonable interpretation in light of the legislative objective.[7] Taxing statutes in particular are to be strictly construed in favor of the taxpayer and against the taxing authority when any ambiguity exists.[8]

---

4. The exact percentages paid were based upon a graduated scale. Sales from $0–$135,000,000 were paid at 2%; $135,000,001–162,000,000 at 2.25%; $162,000,001–194,000,000 at 2.5%; $194,000,001–233,000,000 at 2.75% and $233,000,001 and over at 3%.

5. Although Appellants brought several issues for review, the finding that there were no taxable sales in Missouri is dispositive; therefore, the other issues will not be discussed.

6. *Zip Mail Services v. Dir. of Revenue,* 16 S.W.3d 588, 590 (Mo. banc 2000).

7. *BCI Corp. v. Charlebois Constr. Co.,* 673 S.W.2d 774, 780 (Mo. banc 1984).

8. *A.P. Green Fire Brick Co. v. Missouri State Tax Comm'n,* 277 S.W.2d 544. (Mo.1955).

Section 143.431.1 states "The taxable income of a corporation . . . shall be so much of its federal taxable income . . . as is derived from sources within Missouri as provided in section 143.451." Section 143.451 begins with a restatement of the rule that "Missouri taxable income of a corporation shall include all income derived form sources within this state." The section then goes on to explain the allocation of income derived partially within and partially outside the state, but fails to give a further definition of the phrase "derived from sources within this state." Accordingly, this Court looks to its prior decisions to determine whether the Appellant's income in question is Missouri source income.

 The basic requirement for there to be Missouri source income is that there is some activity by the *taxpayer* in Missouri that justifies imposing the tax.[9] Although corporate activities can be immeasurably diverse, for multi-state income tax purposes they fall into three succinct categories: property, payroll and sales.[10] While Appellants are "related" to ABC, a Delaware corporation that conducts business and pays taxes in Missouri, they are separate legal entities, and as such each must have its own property, payroll or sales in Missouri to be taxed in Missouri.

 The Director's brief states that having property, payroll or sales is not a requirement for taxation when the transactions are between related companies. In an attempt to distinguish the holding in *Central Cooling,*[11] the Director asserts that the case stands only for the principle that common ownership will not allow a corporation to avoid the tax consequences arising from the creation of separate corporate entities. While the holding in *Central Cooling,* does stand for that principal, it undoubtedly must also stand for the reverse. The corporate subdivision instituted by the Appellants created separate legal entities, and they should be treated as such.

As this Court has previously held, in order for the Appellants to be liable for taxes in Missouri, *they* must have had some activity: property, payroll, or sales, in the State of Missouri.[12] ARC is a Delaware corporation; all of its offices, board meetings and employees are located or held in Delaware. Appellant BIC is also a Delaware corporation; it holds its board meetings in Fort Worth, Texas, and pays taxes in that state.

Aside from the current litigation, neither ARC, BIC, nor ARCLP has ever done business, owned property, maintained employees or agents, conducted sales or distributed payroll in Missouri. The licensing agreement between the Appellants and ABC was negotiated and executed entirely outside of the state of Missouri. In addition to the licensing agreement, the Appellants have absolutely no sales—in Missouri or elsewhere—because they sell no products at all. The income the Director attempts to reach is outside the scope of Missouri taxation because the Appellants have no contact, and specifically no sales, within the state.

**IV.**

The decisions of the AHC are reversed, and the cases are remanded.

---

9. *Med. Shoppe Intern., Inc. v. Dir. of Revenue,* 75 S.W.3d 731, 734 (Mo. banc 2002) (emphasis added).

10. RSMo § 32.200. Article IV, section 9. (2000).

11. See, *Central Cooling & Supply Co. v. Director of Rev.,* 648 S.W.2d 546 (Mo. banc 1983).

12. See, *Medicine Shoppe Intern., Inc. v. Director of Rev.,* 75 S.W.3d 731, 734 (Mo. banc 2002).

LIMBAUGH, C.J., BENTON and TEITELMAN, JJ., concur.

WOLFF, J., dissents in separate opinion filed.

STITH and PRICE, JJ., concur in opinion of WOLFF, J.

MICHAEL A. WOLFF, Judge, dissenting.

The economic reality of these cases is simple. The "taxpayers"—or, in light of the result here, perhaps one should say the tax-evaders—are entities that own intellectual property, i.e., patent and trademark rights. These entities, sited in Delaware, license these rights to related corporations that manufacture products sold in Missouri. One holds patents on "Goretex" fabric for outdoor clothing. The other entity holds trademark rights to "Acme" bricks. Without the participation of these "taxpayers," the Gore clothing would not repel water while "breathing" and the Acme product would be a mere unadorned brick. Thus, these "taxpayers" own the intellectual property essential to the products as they are marketed and sold in Missouri. The income derived from sales in this state is Missouri-source income.

It defies economic reality to hold that income derived from the Missouri market—in which these "taxpayers" participate through their related manufacturing companies—is not taxable here.

**Corporate Reorganizations to Avoid Taxes**

One of the great achievements of the legal profession in the past two centuries has been the development and creative use of the corporation. The corporate entity as a separate person is a legal fiction essential to the development of the modern capitalistic society.[1] The invention of the modern corporation allows investors to aggregate capital while risking only their investments, not their own personal resources beyond the amounts invested. The fundamental concept is that the investor and the corporation are different "persons" so that a mere investor is not personally responsible for the liabilities of the corporation.

The overarching question in these cases is whether the Missouri tax statute, section 143.451.1,[2] which taxes "all income derived from sources within this state," permits this salutary legal fiction to be used perversely for avoiding legitimate taxes imposed by the state of Missouri.

In both these cases, the corporate reorganization appears to be simply for tax avoidance. It starts with a company that makes something—bricks, clothing products, or whatever. The making of the product involves two things: the intellectual property (patent or trademark) and the physical product itself. Before the corporate reorganizations here, the same company owned both the intellectual property and the means of production. The manufacturing companies made and sold their products but did not pay royalties to themselves.

But what if a "separate" person owns the intellectual property, i.e., the patents or trademarks? If a separate person holds the intellectual property, such as an inventor who holds a patent, the separate person would be entitled to charge royalties to the person making the product, and

---

1. *See* Reisman, *Toward an Anthropological Science of Law and the Legal Profession,* 57 AM. J. Soc. 121, 126 (1952), *quoted in* LOUIS M. BROWN & EDWARD A. DAUER, PLANNING BY LAWYERS: MATERIALS ON A NONADVERSARIAL LEGAL PROCESS 55 (1978).

2. All references are to RSMo 2000 unless otherwise indicated.

the royalty payments would be deducted from the manufacturer's taxable income.

But in the case of Gore or Acme, what would be the incentive to create a "separate" person to own the intellectual property? How about a "person" that "lives" in a place where there are no taxes to pay on income?

So, here's the tax avoidance scheme: First, a manufacturing corporation creates a separate person in a state (or foreign country, for that matter [3]) that does not tax that person's income. Second, the manufacturer assigns the patent or trademark to the new person, essentially for free. Third, the manufacturer agrees to pay the new "person" royalties for use of the patent or trademark.

To those of us who are unabashed admirers of the modern corporation, this kind of creativity may seem to be an unremarkable use of the corporate fiction. But here is a kicker: the royalty agreement is structured so that most if not all of the manufacturer's profits—but not one cent in excess of the profits—are paid to the "separate" person.

This new "person"—which received the patent or trademark rights for free—then claims that it has no connection with Missouri and owes Missouri no tax on the income it derived from sales of the products in Missouri.

This certainly is clever, but it is absurd to say that Missouri cannot tax the income derived from economic activity conducted on behalf of these "taxpayers" in this state. The income is, in the words of section 143.451.1, "derived from sources within this state." There is nothing in the record seriously to suggest that this corporate reorganization is for some legitimate purpose other to disguise the fact that this income from the manufacture and sale of the taxpayers' products in Missouri is subject to Missouri taxation.

## Facts: The Gore and Acme Corporate Structures

W.L. Gore (Gore) sells its goods, which include "Goretex" and other synthetic materials, in Missouri and other states. Gore is registered to do business in Missouri and files Missouri income tax returns. In 1983, Gore formed "Gore Enterprise Holdings" (Holdings) as a holding company for its patents. Holdings is a Delaware corporation that, for two of three tax periods at issue, had no employees or offices of its own. Holdings' activities, which consisted of collecting royalty payments, were conducted by Gore's employees at Gore's offices. For the third tax period at issue, Holdings rented 120 square feet of space, which held a desk, chair, computer and file cabinet, to house its sole employee, a paralegal.

Gore transferred to Holdings all of its patents in return for Holdings' stock. Holdings then licensed those patents to Gore exclusively in exchange for royalty payments totaling 7.5% of the sales price of all products Gore made in the United States and sold for use in the United States. Seven and one-half percent conveniently amounts to the approximate total of profits Gore historically made on these products. In no event, however, could the royalty payments made by Gore to Holdings exceed Gore's net income.

Acme Brick employed a similar reorganization scheme. Acme Brick formed Acme Royalty Company (Acme Royalty) in

---

3. *See* Glenn R. Simpson, *A New Twist in Tax Avoidance: Firms Send Their Best Ideas Abroad*, Wall St. J., June 24, 2002, at A1.

1991 to manage its trademarks.[4] Acme Brick paid Acme Royalty a portion of its sales in exchange for use of the trademarks in connection with its manufacture, sale and distribution of merchandise within Missouri. Like Holdings, Acme Royalty is a Delaware corporation that, during part of the tax period in question, shared approximately 1,100 square feet of office space with 40 other companies and employed one individual who spent two hours monthly on Acme Royalty business. This individual served as officer and director for Acme Royalty, as well as 20 to 30 other companies. Acme Brick paid Missouri income tax but was allowed a deduction for royalties paid to Acme Royalty.

## A Tax Avoidance Trend

Using this corporate reorganization, these corporations shifted income taxable in Missouri to Delaware, where income from patents and trademarks is tax-free. The Missouri Director of Revenue aptly describes this recent trend in tax avoidance: "[A] bare corporate change can make income that is taxable today not taxable tomorrow." The result is the creation of so-called "nowhere income"—income that is taxed in no state.

"Nowhere income," it might be noted, is not just affecting individual states. The *Wall Street Journal* reports that the Internal Revenue Service is also concerned about loss of federal income tax. Companies set up offshore subsidiaries so they can transfer royalties from sales of products made outside the United States to places like Bermuda. Glenn R. Simpson, *A New Twist in Tax Avoidance: Firms Send Best Ideas Abroad*, WALL ST. J., June 24, 2002, at A1. The *Journal* reports that

more than two dozen pharmaceutical and computer companies have set up subsidiaries in Bermuda. *Id.* "The transfer of intellectual property—such as trademarks and patents—has become so widespread that it has prompted an aggressive crackdown by the Internal Revenue Service on alleged abuses that one IRS consultant says could eventually involve tax claims in the tens of billions of dollars." *Id.*

By moving their profits to places where such income is not taxable, companies are avoiding taxation in places such as Missouri where those profits were derived. These companies argue that they should be immune from income taxation because they have no connection or nexus to the taxing state.

## The Missouri Connection

Missouri taxable income of a corporation "shall include all income derived from sources within this state." Section 143.451.1.

Holdings and Acme Royalty argue that the royalty income is derived from the license agreement, which has no Missouri connection. However, the source of income to Holdings and Acme Royalty is not merely a written license agreement. The two derive income from the use of the intellectual property, which is an essential ingredient in the products sold in Missouri. The products sold in Missouri are just as much a result of the patents and trademarks as they are the result of the physical manufacturing processes. In both cases, Goretex clothing and Acme bricks, the source of income is Missouri's Gore and Acme Brick customers. Gore Enterprise Holdings does not make a cent until Gore makes a sale. Acme Royalty and

---

4. In 1993, Acme Royalty became a limited partnership in which it contributed all of the trademarks and trade names it owned in exchange for 99% interest in the partnership. Brick Investment Company (BIC) was formed to be the general partner. BIC contributed cash in an amount estimated to be one percent of the value of the trademarks in exchange for one percent general partnership interest.

Acme Brick have the same relationship. Missouri sales produce income for Holdings and Acme Royalty; thus, this income is taxable because it is derived from sources within Missouri—Missouri customers.

The tax avoidance scheme that has been endorsed by the principal opinion here was apparently first detected and snuffed out by the taxing authority and the Supreme Court of South Carolina in *Geoffrey, Inc. v. South Carolina Tax Commission*, 313 S.C. 15, 437 S.E.2d 13 (1993). In *Geoffrey, Inc.*, the well-known toy store, Toys R Us, formed a subsidiary in Delaware named Geoffrey[5] to own its trademarks and trade names. Geoffrey had no offices, employees or tangible property in South Carolina. As in the instant cases, Geoffrey executed a license agreement allowing Toys R Us to use its trademarks and trade name. In return, Geoffrey received a royalty of one percent of Toys R Us' net sales. In 1990, Geoffrey had no full-time employees and had an approximate income of $55 million, paying no income tax to any state.

In finding that Geoffrey's royalty income was subject to South Carolina income tax, the court found that "[t]he real source of Geoffrey's income is not a paper agreement, but South Carolina's Toys R Us customers." *Id.* at 18. This Court should apply the *Geoffrey* principle here. The real source of income for Holdings and Acme Royalty is Missouri's Gore and Acme Brick customers—a relationship that is made possible in part by Missouri's business infrastructure and legal protections. "By providing an orderly society in which

Toys R Us conducts business, South Carolina has made it possible for Geoffrey to earn income pursuant to the royalty agreement," the South Carolina court aptly concluded. "That Geoffrey has received protection, benefits, and opportunities from South Carolina is manifested by the fact that it earns income in this state." *Id.*

Missouri's Director of Revenue seeks to tax only that portion of income generated within Missouri's borders. As in South Carolina, this coincides with the notion that assessment of tax is rationally related to the protections the state provides. Missouri, like South Carolina, provides a place that allows these companies to produce their only form of income.

The "taxpayers," Holdings and Acme Royalty, derive economic benefit from the protection of the Missouri marketplace. Their intellectual properties, the patent and trademark rights, are part of the products that are sold. Or put another way, the manufacturing companies are the vehicle through which the "taxpayers" get money from Missouri for their properties.[6] Missouri not only creates a marketplace for these products, including their licenses, but also affords legal protections to these "taxpayers." For instance, if a company were to sell "Goretex" products or "Acme" bricks in Missouri without licenses from these "taxpayers," there is no doubt that these "taxpayers" could use Missouri courts to enforce their rights to the intellectual property.

Missouri offers a market to these companies for making money from their licenses through their related manufacturing

---

5. Geoffrey is the cartoon giraffe on the Toys R Us logo.

6. An alternative analysis is to consider piercing the corporate veil. *See, e.g., 66, Inc. v. Crestwood Commons Redevelopment Corp.*, 998 S.W.2d 32 (Mo. banc 1999). But courts do not lightly pierce the corporate veil, *id.*,

*and it is not necessary to do so here. It seems preferable to treat Gore Enterprise Holdings and Acme Royalty as separate entities from their corporate creators and to recognize that they participate in the Missouri marketplace with their creators.*

companies. Missouri, accordingly, is due tax from income that is derived within its borders from its citizens.

### Doing Business in Missouri

Section 143.441.1(1) defines a corporation subject to Missouri taxation to include "... every corporation, association, joint stock company, and joint stock association, licensed to do business in this state, or doing business in this state, and not organized, authorized, or existing under the laws of this state...." Both Holdings and Acme Royalty argue that they did nothing in Missouri and that the director's focus is instead on the conduct of Gore and Acme Brick.

However, a taxpayer need not have a tangible, physical presence within a state for income to be taxable there. It is not necessary for Holdings and Acme Royalty to be the actual "seller" of the goods for Missouri to tax the income they receive from the sales. It is enough that the transactions, from which Holdings and Acme Royalty receive income, occur in Missouri and, thus, are subject to state

regulation and protection. The controlling principle is set forth in *Int'l Harvester Co. v. Wisconsin Dep't of Taxation*, 322 U.S. 435, 441–42, 64 S.Ct. 1060, 88 L.Ed. 1373 (1944), where the United States Supreme Court said: "A state may tax such part of the income of a non-resident as is fairly attributable either to property located in the state or to events or transactions which, occurring there, are subject to state regulation and which are within the protection of the state and entitled to the numerous other benefits which it confers." [7]

For these reasons, I would find, as did the South Carolina Supreme Court, that this "nowhere" income is properly taxable somewhere. And one of those places is the State of Missouri.[8]

This is not a case where Gore, for example, is paying royalties to inventors who created and patented their product materials. Holdings created nothing. Gore created Holdings to shield Gore's profits from taxation. The same is true of the trademark rights held by Acme Royalty. These profits, derived from sales to Missouri cus-

---

7. The language used to uphold a state's right to tax an out-of-state corporation mirrors the language used by the United States Supreme Court in personal jurisdiction cases. The due process limitation on a state's exercise of jurisdiction is not offended where a defendant corporation purposely avails itself of the benefits and protections of the state's laws. *Quill Corp. v. North Dakota*, 504 U.S. 298, 112 S.Ct. 1904, 119 L.Ed.2d 91 (1992). *See also, Hanson v. Denckla*, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958), and *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984).

8. A simple alternative would seem to be available, though the director of revenue did not pursue it in these cases. Even if Gore Enterprise Holdings and Acme Royalty are not subject to Missouri tax, as the principal opinion holds, the director does have tax returns from W.L. Gore and Acme Brick, which paid their profits as royalty fees to these supposedly

untouchable holding companies. Perhaps the director should disallow the deduction of such royalty payments by W.L. Gore and Acme Brick and tax their Missouri income accordingly. That appears to be authorized by section 143.451.7, which allows deduction "for expenses in determining Missouri taxable income as were incurred ... to produce such income...." The director also has statutory authority to prescribe regulations to adjust, assess or compute the tax liability of affiliated corporations "in such manner as clearly to reflect the Missouri taxable income derived from sources within this state and in order to prevent avoidance of such tax liability." Section 143.431.3(5). By either route, where related corporations are using the deduction for royalty payments to remove income earned in Missouri from the amount to be taxed, the director should disallow the deduction. That would ensure that these companies that produce income from Missouri pay the taxes they owe to this state.

tomers but siphoned off to related companies through royalty agreements, are subject to the state's tax.

The modern corporation is an invention that lawyers can rightly be proud of. But the result reached here by the principal opinion rewards this invention inappropriately. The legal fiction of the corporation should not override economic reality.

The bottom line, economic reality is simple: These companies earn money in Missouri. Under section 143.451.1, they should pay taxes here.

I respectfully dissent.

