**Eugene and Tapian REEVES, Plaintiffs–Appellants,**

v.

**Donna SNIDER, Assessor of Pemiscot County, Missouri, Defendant–Respondent.**

No. 25260.

Missouri Court of Appeals, Southern District, Division Two.

July 31, 2003.

Opinion Denying Rehearing Aug. 21, 2003.

---

**8.** The motion of Double D and the Eftinks to dismiss is denied.

Eugene and Tapian Reeves, Caruthersville, pro se.

Stephen P. Sokoloff, Kennett, for respondent.

KENNETH W. SHRUM, Judge.

This is an appeal from a circuit court judgment affirming the assessments for 1999 on properties owned by Eugene and Tapian Reeves ("Taxpayers"). Respondent Donna Snider ("Snider") was the Pemiscot County assessor during the relevant period. Taxpayers state four reasons why they believe the State Tax Commission ("STC"), and the trial court upholding the STC's decision, erred. We believe, however, the real issue is whether the affirmance of the assessed valuations for the subject properties was proper and nondiscriminatory. We affirm.

## FACTS

During the 1999 tax year, Snider reassessed several tracts of Pemiscot County real estate owned by Taxpayers. In doing so, Snider used a "new index" and a "mass appraisal system" called the "Honeycutt Cost System." To effectively evaluate the properties, two certified appraisers helped Snider in the process. Of the twenty-five properties thus reassessed, only one was not increased in value from the 1998 tax year.

Initially, Taxpayers attempted to convince Snider that her reassessment values were wrong. They insisted Snider failed to adequately inspect the properties, and her valuation exceeded fair market value. In part, they claimed the valuations of their property should have been based solely on the average percentage of increases in the county and not fair market value.

Upon failing to convince Snider of their claims, Taxpayers appealed to the county board of equalization. After the board refused to lower the valuations and assessments on twenty-two tracts of Taxpayers' real estate, they appealed to the STC.

Taxpayers' appeal to the STC raised many grounds for overturning the valuations. In part, they claimed there was no "physical inspection" of the properties within the meaning of the applicable stat-

ute. They also raised a due process violation because of an alleged presumption by the board of equalization that Snider had correctly evaluated the subject properties. The STC affirmed the decision of a hearing officer that upheld the assessments.

Taxpayers then filed a petition in the circuit court for review of the STC's decision. The circuit judge affirmed the STC's decision and order. This appeal followed. Additional facts are given as we discuss Taxpayers' arguments.

## STANDARD OF REVIEW

■ Our review of this case is directed to the findings and decisions of the STC. *Lebanon Properties I v. North,* 66 S.W.3d 765, 767[1] (Mo.App.2002). Review of factual challenges to the STC's order is limited to determining if the STC's order is supported by competent and substantial evidence as a whole, or whether it is arbitrary, capricious, unreasonable, unlawful, or in excess of its jurisdiction. *Evangelical Retirement Homes of Greater St. Louis, Inc. v. State Tax Comm'n,* 669 S.W.2d 548, 552 (Mo.banc 1984); *Lebanon Properties I,* 66 S.W.3d at 767[2]. "The evidence must be considered in a light most favorable to the administrative body, together with all reasonable inferences which support it...." *Hermel, Inc. v. State Tax Comm'n,* 564 S.W.2d 888, 894 (Mo.banc 1978).

■ Contrarily, questions of law when decided by an administrative agency, as contrasted with questions of evidence, are matters for the independent judgment of the reviewing court. *King v. Laclede Gas Co.,* 648 S.W.2d 113, 114[1] (Mo.banc 1983). Stated differently, "the decision of the administrative agency on a question of law does not preclude, restrict, or control review of the issue by the court." *Ceramo*

Co., *Inc. v. Goldberg,* 650 S.W.2d 303, 304 (Mo.App.1983).

## DISCUSSION AND DECISION

■ At the outset, we note Snider has requested that we dismiss Taxpayers' appeal due to deficiencies in their appellate brief. That motion, which was taken with the case, is denied.

We caution, however, that this ruling does not mean we find Taxpayers' brief complies with Rule 84.04.[1] It fails for a multitude of reasons. Even so, this excerpt from *Norman v. Ballentine,* 627 S.W.2d 83 (Mo.App.1981), explains our decision to address Taxpayers' claim of reversible error:

> "Inadequate briefs of counsel are a disservice to parties so represented and a burden on the system of justice. *See Thummel v. King,* 570 S.W.2d 679, 686 (Mo.banc 1978). Because of the result here reached, however, suspension of strict application of Rule 84.04 will work no hardship on the respondent. Our jurisdiction is apparent from the record, and we have been able to determine the facts of the case and the issues to be decided from the briefs and transcript. A punitive order of dismissal would serve no purpose here, but we trust that members of the bar will take heed of the warning implicit in our discussion of this matter."

*Id.* at 85.

### Point I: The Presumption Issue

When the STC affirmed the hearing officer's decision, it declared, *inter alia,* "[i]t is well established law that *there is a presumption in favor of the board of equalization* as found by the Hearing Officer."[2] (Emphasis supplied.)

---

1. All rule references are to Supreme Court Rules (2003), unless otherwise indicated.

2. The following states the "presumption" referenced by the STC:

■ In Point I, Taxpayers charge the STC erred by "relying on a presumption that the decision of the Pemiscot Board of Equalization was correct, instead of making findings based on competent and substantial evidence of values and that valid assessment increases had occurred." Taxpayers advance two reasons why the presumption does not attend here.[3] However, we need not address or consider Taxpayers' Point I argument. This follows because any error by the STC in relying on this presumption—if it was error—would not affect the merits of Taxpayers' appeal. Rule 84.13(b).

■ To explain, Taxpayers were the moving parties seeking affirmative relief, and as such, they bore the burden of proving the vital elements of their case, i.e., the assessments were "unlawful, unfair, improper, arbitrary or capricious." *Cupples Hesse Corp. v. State Tax Comm'n*, 329 S.W.2d 696, 702 (Mo.1959); *Westwood P'ship v. Gogarty*, 103 S.W.3d 152, 161[8] (Mo.App.2003); 84 C.J.S. *Taxation* §§ 710, 726. This is true regardless of the existence or non-existence of the challenged presumption. As the Supreme Court of Missouri explained, "even were we to hold that it [the presumption] has been overcome, the burden of proof on the facts and inferences would still remain on petitioner, for it is the moving party seeking affirmative relief." *Cupples*, 329 S.W.2d at

702[16]. *See also* 84 C.J.S. *Taxation* § 710, which states: "Even where there is no presumption in favor of the assessor's ruling, if no evidence is offered in support of the complaint, the reviewing board is justified in fixing the valuation complained of in the amount assessed by the assessor."

To prevail, Taxpayers had to "present an opinion of market value and then ... present substantial and persuasive evidence that the proposed value is indicative of the market value of the subject property on tax day." *Daly v. P.D. George Co.*, 77 S.W.3d 645, 651 (Mo.App.2002). They utterly failed in this regard. As the STC correctly found, Taxpayers "elected to offer no evidence of value, with the exception of one parcel."[4] Taxpayers do not contend otherwise.

■ Because Taxpayers did not carry their burden of proving the assessments were excessive or discriminatory, we would be compelled to affirm the STC's order upholding the assessed valuations for 1999 *even if* we found the STC erred in relying on the challenged presumption. *See Gogarty*, 103 S.W.3d at 161 (holding the statutory abolition of the presumption in favor of an assessor's evaluation does not relieve a taxpayer of the burden of proving by a preponderance of the evidence that the

---

"There is a presumption of validity and of good faith in the actions of taxing officials, and of the correctness of assessments[,] and *such presumptions attach to the actions of the county and state boards of equalization,* as well as to the valuations of assessors." (Citations omitted.)
*May Dept. Stores Co. v. State Tax Comm'n*, 308 S.W.2d 748, 759[13] (Mo.1958) (emphasis supplied).

**3.** Taxpayers point out that the presumption of correctness in favor of an assessor's evaluations and assessments was legislatively abolished in 1992. § 138.060.1, RSMo Cum.Supp.

(1992). In part, they appear to argue the abolition of that presumption reveals a legislative intent also to eliminate the presumption that previously attached to the actions of boards of equalization.

**4.** Taxpayers adduced evidence concerning the recent purchase price of one parcel. They argued the purchase price was conclusive proof of that parcel's fair market value. This contention was ruled adversely to Taxpayers by the STC. Ultimately, Taxpayers' appeal as to this parcel was voluntarily dismissed in the circuit court.

property was improperly valued). Under the circumstances, any opinion expressed by this court regarding the status of the presumption, that boards of equalization act correctly, would be advisory only. Appellate courts do not render advisory opinions. *Air Evac EMS, Inc. v. Goodman*, 883 S.W.2d 71, 74[3] (Mo.App.1994). Point denied.

### Point III: Assessor's Authority To Use Appraisers [5]

Section 137.115.10 required Snider to "conduct a physical inspection" of any real estate upon which she had increased the valuation "by more than seventeen percent since the last assessment." [6] In attempts to comply with this statutory mandate, Snider hired two licensed appraisers (Mark Hensley and Billy Keefer) to make such inspections.

■ Taxpayers' third point maintains the subject properties were unlawfully reassessed because Snider failed to prove she had authority to hire these appraisers. In developing this argument, Taxpayers concede that section 137.230.2 "would authorize" assistance for Snider, i.e., authorize her to use the services of appraisers Hensley and Keefer, *but* insist that Snider would only have this authority *if* an order to that effect was entered of record by the county commission.[7] They assert Snider bore the burden of proving the existence of such an order, she failed to do so, and it was an erroneous conclusion of law for the

STC to hold that Taxpayers had to come forward with evidence showing a lack of authority.

The fallacy in Taxpayers' argument is their premise that Snider had to adduce evidence on the "authority" issue. As explained in Point I, Taxpayers had the burden of proving the vital elements of their case, i.e., the assessments were *unlawful*, unfair, *improper*, arbitrary, or capricious. If Taxpayers' position is that the assessments were unlawful or improper because Hensley and Keefer were not authorized to participate in the reassessment, they had to timely put the issue before the STC in some fashion, i.e., either by pleading, or objection to evidence, or oral argument. *See Textron Financial Corp. v. Trailiner Corp.*, 965 S.W.2d 426, 429[1] (Mo.App. 1998) (holding generally a party with the burden of proof of an element of its case must also plead that element). *See also State ex rel. Tel–Central of Jefferson City, Inc. v. Public Service Comm'n*, 806 S.W.2d 432, 435[5] (Mo.App.1991) (holding where telephone customer alleged in its complaint before the PSC that it had paid the telephone company for service and therefore discontinuance of service was unauthorized, the customer, having asserted the affirmative of the issue, had the burden of proving payment).

Here, Taxpayers never injected the "lack of authority" issue into the case in any fashion before the STC rendered its decision.[8] They could have injected this

---

**5.** We address Point III before Taxpayers' second point for ease of discussion.

**6.** All statutory references are to RSMo Cum. Supp. (1998), unless otherwise stated.

**7.** In relevant part, section 137.230.2 provides: "2. In all counties the county commission may, in addition to the foregoing provisions for securing a full and accurate assessment of all property ... or in lieu thereof, *by order entered of record*, adopt for the whole

... county ... any ... suitable and efficient means or method to the same end ... and may require the assessor, or any other officer, agent or employee of the county to carry out the same, and may provide the means for paying therefor out of the county treasury." (Emphasis supplied.)

**8.** Taxpayers' only case authority is *Mark Century Corp. v. Tiger Broadcasting Co.*, 509 S.W.2d 737, 739 (Mo.App.1974). They cite it for the proposition that the "proponent of

"authority" issue via their petition for review, but failed to do so. They could have objected to the appraisers' testimony and reports on the basis that Snider was never authorized to hire them, but failed to do so. They cannot "sandbag" the assessor, the STC, and this court by raising the issue as a post-hearing matter. Point denied.[9]

### Point II: Sufficiency of the Evidence

 For their second point on appeal, Taxpayers argue the STC erred "in failing to find that there had been no valid assessment increases applied in 1999" by the assessor because her "office records (property cards) offered into the record … revealed no assessment increases to the parcels in 1999." In what we can only guess is the argument section of Point II, Taxpayers claim "that the assessor … offered property cards from the assessor's office to prove the assessment in 1999. The property cards show no assessments in 1999. … This was not controverted. Therefore, the 1997 assessment values were not changed in 1999." [10]

From what we can discern, Taxpayers claim Snider *only offered property cards* to prove valuations and assessments for the 1999 tax year, the cards did not reveal any assessments for that year, and consequently, there was insufficient evidence to sustain the STC's decision. The record, however, refutes the initial premise of this argument, i.e., the cards were the only evidence put before the STC concerning the subject assessments. The valuations and appraisals by Snider for 1999 were adduced via the appraisers' testimony and Taxpayers' own exhibits.

For instance, appraisers Hensley and Keefer testified to the methods used in appraising the properties and then gave the assessor's 1999 evaluation as to several tracts.[11] Also, Keefer prepared two narrative reports totaling seventy-five pages addressing the appraisals for five of the properties. The record reveals instances when the appraisers were asked if an unidentified record correctly reflected Snider's evaluation for 1999, they answered affirmatively, but they were never asked what the evaluation was. All such evidentiary omissions, however, were cured by Taxpayers. Specifically, Taxpayers prepared a chart and put it in evidence listing the "Assessors['] proposed 1999 assessment" for each piece of property. Moreover, the Pemiscot County board of equali-

---

authority must come forward with evidence to establish such authority." That case is inapposite because the defendant Tiger Broadcasting injected the "lack of authority" issue by pleading affirmatively that a Mark Century employee who signed the subject contract lacked authority to do so. With the issue thus raised, Mark Century did not present evidence regarding its employee's authority. Those are not the facts of this case.

9. The "lack of authority" argument is particularly disingenuous for yet another reason, namely, Taxpayers put into evidence certain records from the office of the Pemiscot County circuit clerk showing that the county had paid Hensley and Keefer for their work. Consequently, this supports the inference that the county commission had authorized Snider to hire these appraisers.

10. Due to the deficient record presented on appeal, we are unsure of the evidentiary purpose of these property cards. Certain property cards were utilized during deposition testimony of appraisers Hensley and Keefer, but the two testified these cards contained 1999 valuations. These appear not to have been filed with this court. Property cards also were used to assist in the appraisal process. Whatever the purpose of these cards that lack 1999 valuations, it is of no consequence. This follows because there was an abundance of competent and substantial evidence to support the STC's decision as we point out in the body of this opinion.

11. We note these methods were approved in *Winters v. Jenkins*, 825 S.W.2d 317, 318–19[2] (Mo.App.1992).

zation's "Final Assessment" report for 1999 on each tract was filed with the STC, thus providing additional evidence of the 1999 assessments of Taxpayers' property. Finally, in the "Complaint For Review of Assessment" filed by Taxpayers with the STC, they listed the fair market value of the property *as found by the assessor* for 1999.

Guided by our standard of review, i.e., we view the evidence in the light most favorable to the STC's decision, we find, in this record, ample competent and substantial evidence to support the STC's implicit finding that Snider *did* appraise and reassess Taxpayers' properties for 1999. *See Savage v. State Tax Comm'n*, 722 S.W.2d 72, 74–75 (Mo.banc 1986). Point II is denied.

### Point IV: Adequacy of "Physical Inspection"

■ In their final point on appeal, Taxpayers allege the STC erred in finding "that looking at the property from the street is in compliance with the physical inspection requirements of [section 137.115.10] because such conduct is not a physical inspection." In pertinent part, the statute provides: "If the assessor increases the assessed valuation ... by more than seventeen percent ... then the assessor shall conduct a physical inspection of such property." § 137.115.10. Taxpayers assert Snider and the appraisers merely stopped by the properties and viewed them from the street. Consequently, they claim this activity does not fall within the meaning of the term "physical inspection" as contemplated by the statute.

■ "The seminal rule of statutory construction directs this court to determine the true intent of the legislature, giving reasonable interpretation in light of the legislative objective." *ACME Royalty Co. v. Dir. of Revenue*, 96 S.W.3d 72, 74[3] (Mo.banc 2002). Where the statute's language is clear and unambiguous, there is

no room for statutory construction. *Wolff Shoe Co. v. Dir. of Revenue*, 762 S.W.2d 29, 31 (Mo.banc 1988). To make that determination, we must decide whether the statute's terms are plain and clear to one of ordinary intelligence. *Id.* at 31[4]. In so doing, we give the language used its plain and ordinary meaning. *Cook v. Cook*, 97 S.W.3d 482, 485[9] (Mo.App.2002); *Wood v. Wood*, 94 S.W.3d 397, 405 (Mo. App.2003). Absent a statutory definition, the plain and ordinary meaning of a word is derived from the dictionary. *Cox v. Dir. of Revenue*, 98 S.W.3d 548, 550[4] (Mo. banc 2003).

In attempting to explain the meaning of the word "inspect," Taxpayers first provide this court with a dictionary definition as follows: "To look carefully at or over; view closely and critically." BLACK'S LAW DICTIONARY 797 (6th ed.1990) defines "inspection" as "[t]o examine; scrutinize; investigate; look into; check over; *or view for the purpose of ascertaining the quality,* authenticity or *conditions* of an item ... *residence* ... etc." (Emphasis supplied.) WEBSTER'S NEW INTERNATIONAL DICTIONARY 1286 (2nd ed.1954) defines "inspect" as "to look upon." An inspection may be very general, or it may be very minute. 44 C.J.S. *Inspection* § 1.

Snider testified that each property was visually inspected to determine if there were improvements or damage to the exterior of the properties. Further, she claimed, if necessary, she would "go around and check around the property." Moreover, Snider claimed that her methods of inspection were approved by the "state." She also stated that she compared each property to similar property in the neighborhood to ensure a fair valuation. Hensley testified to the inspection process as follows:

"Basically what we do is we gather all the information for a certain neighborhood, we'll take those property record

cards and we'll go out and physically look at each individual piece of property in this area. We will compare it with other pieces of property that are like and similar.

"We'll also inspect the property to see if any adjustments or major improvements have been made from it from the previous inspection from the previous years. And if it has been, if there's been additions or any major adjustments made to the property, we will either get out and physically measure all additions and so forth, additions that would be made to the property, or make any other additional changes that have been made."

Hensley admitted that no interior inspection was conducted, but "we physically stop, inspect each individual piece of property." Keefer testified that he then reviewed each property to ensure valuation was fair and accurate. As noted earlier, Keefer also conducted separate appraisals on five buildings.

The testimony overwhelmingly indicates that the inspections, conducted by the appraisers and Snider, clearly meet the "physical inspection" requirements, as that term is used in the statute. The instant inspections fell within any definition cited herein, even the definition provided by Taxpayers.

We are confirmed in this view by a case extremely similar to that found here. In *Potter v. Town of Clarendon*, 118 Vt. 278, 108 A.2d 394 (1954), the Vermont supreme court held that the term "inspect" as used in the state's assessment statutes is defined as "to look on or into, to view and examine officially." *Id.* at 395. In making their appraisal, the assessors viewed the property and utilized their general knowledge gained from living in the neighborhood and town. The court held:

"Common sense and practical everyday business experience are their [taxing officials'] best guides. Taxation is a practical problem. A tax will not be rendered void by reason of the manner in which any matter is determined by the listers, if such matter rests fairly within their legitimate discretion."

*Id.* at 396 (citation omitted).[12]

■ Here, the appraisers and Snider did just that, i.e., examined the realty and used their best judgments as professionals in valuation of the properties. There is no evidence that the properties were valued at anything other than their fair market value or true value in money. The purpose of the statute has been fulfilled.[13] Point denied.

The judgment of the trial court, which affirmed the STC's decision and order, is affirmed.

MONTGOMERY, J. and RAHMEYER, C.J., P.J., concur.

### OPINION ON MOTION FOR REHEARING

In a motion for rehearing, filed per Rule 84.17(a)(1), Taxpayers allege, *inter alia*,

---

**12.** The *Potter* decision was later cited with approval in *Devoid v. Town of Middlebury*, 134 Vt. 69, 350 A.2d 349, 351–52 (1975).

**13.** In so holding, we have not ignored Taxpayers' reliance upon later amendments to the statute, namely, the addition of subsection 12 in 2002 further delineating the term "physical inspection." We are mandated to determine the intent of the *enacting* legislature, however, and not that of a later body. *Springfield Gen. Osteopathic Hosp. v. Industri-* al Comm'n, 538 S.W.2d 364, 369[4] (Mo.App. 1976). Moreover, subsection 12 requires "an on-site personal observation and review of all exterior portions of the land and any buildings and improvements." This was done here. We further note that Snider and the appraisers specifically denied merely conducting a "drive-by" inspection as condemned in the amendment, and their testimony supports such an assertion.

that this court misstated the record when we wrote, "Taxpayers never injected the 'lack of authority' issue into the case in any fashion before the STC rendered its decision." Technically, Taxpayers are correct. They did raise the "lack of authority" before the STC handed down its decision. As Taxpayers fully admit in their motion for rehearing, however, the first time they raised the issue was on November 28, 2000. This was over one month after the evidentiary hearing, but before the STC rendered its decision. It appears that Taxpayers addressed the issue only as an afterthought, or purposely waited until after the hearing so that Snider could not present evidence to rebut the allegation. In either event, Taxpayers did not timely inject the lack of authority claim into the case, i.e., before or during the evidentiary hearing at a time when Snider could have responded with evidence. Accordingly, we stand by our holding, namely, that Taxpayers cannot "sandbag" Snider, the STC, and this court by raising the issue as a post-hearing claim.

Taxpayers' motion for rehearing is denied.