**Marion TIBBS, Assessor Butler County, Missouri, Plaintiff–Respondent,**

v.

**POPLAR BLUFF ASSOCIATES I, L.P., Defendant–Appellant.**

No. SD 31385.

Missouri Court of Appeals,
Southern District,
Division Two.

Jan. 9, 2013.

Application for Rehearing and/or Transfer Denied Jan. 31, 2013.

Application for Transfer to Supreme Court Denied April 30, 2013.

built at a total cost of $4,324,356. The Butler County Assessor ("the Assessor") determined the fair market value of the property to be $2,668,060; however, the State Tax Commission ("the Commission") determined the fair market value to be $888,300 for the tax years 2007 and 2008. The Assessor asserts two points in this appeal: first, the Commission erred in "ruling that low income housing must be valued using the 'Maryville Formula'" and, second, the Commission erred because its use of the "Maryville Formula" to value subsidized housing rather than the methods "used for other apartments and rental housing" results in a separate subclassification of residential real property contrary to article III and article IV(b) of the Missouri Constitution. Because neither issue was raised before the Commission and thereby properly preserved for appellate review, Commission error cannot be premised upon either ground.

### Facts and Procedural History

The duplexes at issue are subsidized housing under the Internal Revenue Code and are required by the terms of a land-use restriction agreement to be rented at below-market rent to low-income seniors. The United States and Missouri provide federal and state income tax credits to encourage the construction or rehabilitation of affordable housing for low-income individuals and families. These tax credits may be sold or held by the initial owner and can be taken each year for ten years. For housing in Missouri, the federal and state income tax credits are administered by the Missouri Housing Development Commission ("MHDC").[1]

Richard D. Dvorak, of Overland Park, KS, for Appellant.

Patricia L. Hughes, of Liberty, MO, for Respondent.

GARY W. LYNCH, J.

In 2005 and 2006, Poplar Bluff Associates I, L.P. ("PB Associates"), built a forty-unit housing complex, which included: twenty two-bedroom, two-bath units; twenty one-bedroom, one-bath units; eighty-five parking spaces and forty-four covered parking spaces; a community room; and an office. The complex was

---

1. For general background information on subsidized housing, see Missouri Housing Development Commission, Rental Production > Low Income Housing Tax Credit (LIHTC) Program, http://www.mhdc.com/rental_production/low_inc_tax_pgrm.htm (last visited Nov. 14, 2012); Megan J. Ballard, Profiting from Poverty: The Competition Between For-Profit and Nonprofit Developers for Low-Income Housing Tax Credits, 55 Hastings L.J. 211, 211–19 (2003).

PB Associates applied to the MHDC for an allocation of federal and state income tax credits in connection with the construction of the duplexes at issue in this case and was allocated federal and state income tax credits in the approximate total annual amount of $626,000 for ten years in exchange for PB Associates' agreement to rent the duplexes at below-market rents to low-income seniors for thirty years. PB Associates sold limited partnership interests in itself for an aggregate of $3,546,546 in cash. The limited partnership interests entitled the purchasers to receive the income tax credits and offset the credits against their federal and state income tax liabilities.[2] PB Associates borrowed $800,000 and used those loan proceeds and the proceeds from the sale of the limited partnership interests to construct the duplexes at a cost of $4,324,356. Included in this cost was a $475,000 fee that PB Associates paid its general partner for the general partner's services in developing the duplexes. The duplexes were completed in 2006.

The Assessor determined the fair market value of the duplexes on January 1, 2007, was $2,668,060. PB Associates disagreed and appealed to the Butler County Board of Equalization ("Board of Equalization"). The Board of Equalization "affirmed" the Assessor's valuation. Based on the Assessor's notice of change in assessed value, dated June 25, 2007, the Assessor's valuation would produce approximately $18,150 in real property taxes. PB Associates requested review by the Commission of the Board of Equalization's valuation, see section 138.430.1, and pro-

posed a fair market value for the duplexes equal to $690,000.[3] PB Associates' proposed valuation would produce approximately $4,695 in real property taxes.[4]

An evidentiary hearing was held by the Commission's Hearing Officer on October 29, 2008. The only issue before the Hearing Officer was the "fair market value" of the duplexes on January 1, 2007. In addition to the facts already set out, the evidence presented at the hearing included the following.

The duplexes are "subsidized housing" under Section 42 of the Internal Revenue Code,[5] and are known as the Idlewild Apartments or Idlewild Estates. The duplexes are located on 7.33 acres with an office, community room, and covered and surface parking. The general partner of PB Associates has little or no cash capital invested in the duplexes. At the time of the hearing, the duplexes rented for $415 a month for the one-bedroom units and $468 a month for the two-bedroom units.

A limited partner receives the tax credits over ten years, but PB Associates must maintain the duplexes in compliance with MHDC rules for thirty years. PB Associates' failure to do so could result in the loss of future tax credits and the recapture of tax credits taken in the past.

In April 2006, PB Associates entered into a Low–Income Housing Tax Credit Land Use Restriction Agreement ("LUR Agreement") with the MHDC for the duplexes "as a condition precedent" and "in consideration of receiving an allocation of" federal and state income tax credits. The LUR Agreement requires the duplexes to

**2.** See Ballard, supra, at 216–19 & nn. 31–32.

**3.** All statutory references are to RSMo 2000, unless otherwise indicated.

**4.** We use this calculation because PB Associates shows this as the tax for the Commis-

sion's valuation of $888,300. We do not reach a determination if it is the correct mathematical amount.

**5.** See 26 U.S.C. § 42 (West 2011) (effective October 4, 2004).

be rented for below-market rents to residents fifty-five years and older who earn sixty percent or less of the median income for the area (approximately $20,000 or less annually). The LUR Agreement also provides that it "shall be placed of record in the real property records of the county," and "the covenants contained herein shall run with the land." The LUR Agreement further provides that the MHDC "may void" any transfer of the duplexes if the transferee "fails to assume in writing the requirements of [the LUR Agreement]," and "no ... transfer ... shall occur without the prior written consent of MHDC." In addition, the LUR Agreement provides the MHDC may apply for specific performance of the LUR Agreement. The Rental Housing Programs Application attached to the LUR Agreement shows estimated real estate taxes for the duplexes in the amount of $14,000. The LUR Agreement permits PB Associates to request a rent increase annually and provides that the MHDC "shall approve rental increases sufficient for the Owner to compensate for any net increases in taxes (other than income taxes) over which the Owner has no effective control," however, it will not consider any request for an increase greater than seven percent of the existing rent, and rents shall not exceed the maximum allowed under the federal and state laws related to subsidized housing.

The Assessor and PB Associates "stipulated to a net operating income of $78,970, a blended loan constant of 7.47, and a tax rate of .81 percent" for the duplexes. The parties also agreed that PB Associates borrowed $800,000 to construct the duplexes.

In its Order Affirming Hearing Officer Decision Upon Application for Review, the Commission stated:

It is within the State Tax Commission's discretion to determine what method or approach it shall use to determine the true value in money of property. The correct methodology for valuing subsidized housing projects is the methodology set out in *Maryville Properties* and followed by [PB Associates]. That methodology is accurate because (1) rent restrictions are considered through the use of actual income rather than market income; (2) additional management requirements and expenses are accounted for through use of actual expenses which are in excess of market expenses; and (3) the actual loan-to-value ratio and the subsidized interest rate demonstrates and accounts for any and all risks involved in the property as well as the benefits flowing to the property.

(Internal footnotes omitted).

PB Associates called state-certified appraiser John T. Robertson and also submitted the written testimony of state-certified appraiser Robert E. Marx. Robertson and Marx determined an "equity dividend rate" equal to nine percent for the duplexes was appropriate based on sales of non-subsidized or "conventional" apartments with upward adjustments for "marketability," "illiquidity," and a debt-to-equity ratio of twenty-to-eighty percent. The equity dividend rate is the return an equity investor would require on its investment to convince the investor to invest in the property. Tax credit equity is a subsidy and is not equity from which an investor would want a return. Based on Robertson and Marx's opinion that an appropriate equity dividend rate for the duplexes was nine percent, PB Associates took the position before the Hearing Officer that the duplexes had a value under the "Maryville Formula" of $721,303 on January 1, 2007. Kenneth N. Vitor, an officer of PB Associates' general partner, testified that there is no active market for the sale of subsidized housing. Robertson also testified that

there is a "lack of sales" of subsidized housing "in the market."

The Assessor called certified general real estate appraiser Charles E. Trail. Trail testified: He prepared an appraisal of the duplexes that is "restricted . . . for use in valuing subsidized housing," that "is not a market value," and that is "based on application of the Maryville Properties formula." He did not prepare a cost- or sales-comparison-approach appraisal of the duplexes and noted that "there is not an active market of subsidized housing properties." Based on the *Maryville* and *Lake Ozark Village* decisions,[6] he calculated an equity dividend rate of .3952 percent based on "information and factors from" the specific duplexes at issue. In Trail's view, these decisions indicate you should not "use market rates, such as conventional markets, but you use rates generated by . . . the subject property or . . . at best, the subject market segment, which is subsidized housing." The equity dividend rate is the cash-on-cash rate. The source of non-borrowed funds actually used in the construction of subsidized housing (i.e., whether generated by the sale of tax credits and required to be so used, or contributed by an investor) does not matter in calculating the equity dividend rate for the subsidized housing under the "Maryville Formula." Equity in a property "is the difference between what [the] property is worth and what's owed on it." With a newly constructed property that is being put to its highest and best use, the cost of the property's construction should be "similar" to the property's worth. Although "true value in money" means what a willing buyer would pay a willing seller in an arm's-length transaction, he testified this concept was not relevant to the valuation of subsidized housing in Missouri because the Commission required subsidized housing to be valued in "a certain way."[7] Trail's opinion was that the duplexes had a value under the "Maryville Formula" equal to $3,648,081 on January 1, 2007.[8]

On April 1, 2009, the Hearing Officer adopted the view of the experts for PB Associates, with the exception that the Hearing Officer eliminated the upward adjustments for marketability and illiquidity and determined the equity dividend rate to be 8.375 percent. Using this equity dividend rate, the Hearing Officer determined the true value in money of the duplexes to be $888,300 on January 1, 2007, under the "Maryville Formula." The Hearing Officer applied the "Maryville Formula" as follows:

Overall capitalization rate:

Ratio of loans to "value" [$800,000 divided by $4,324,356 equals .185] times the loan constant [.0747]                                                             1.38%

Ratio of "equity" to "value" [$3,524,356 divided by $4,324,356 equals .815] times the "equity dividend rate" [.08375]                                         6.70%

6. We understand Trail's references to the "Maryville" and "Lake Ozark Village" decisions to be to the Commission's administrative decisions in *Maryville Properties, L.P. v. Nelson*, 2000 WL 509484 (Mo. State Tax Comm'n Apr. 27, 2000), as modified *by Maryville Properties, L.P. v. Nelson*, 83 S.W.3d 608 (Mo.App. W.D.2002), and in *Lake Ozark Village v. Whitworth*, 2004 WL 1172803 (Mo. State Tax Comm'n Apr. 29, 2004).

7. He only valued it this way because of the Commission's finding that the "Maryville Formula" would be used.

8. We have arrived at somewhat different numbers in our calculations of the formula used; however, for the purpose of the issue raised in this appeal, it is not necessary to set forth those numbers.

| | |
|---|---|
| "Tax rate" | 0.81% |
| Sum | 8.89% |
| Net operating income | $78,970 |
| "Indicated value" [$78,970 divided by .0889] | $888,301.46 |

The Assessor filed an application for review with the Commission, *see* section 138.432, claiming that the Hearing Officer erred in accepting PB Associates' capitalization rate and that the Hearing Officer inappropriately, incorrectly, and improperly gave weight to PB Associates' band of investment method to calculate the value of the equity portion of the capitalization rate. The Assessor's application requested the Commission to enter "[a]n order establishing the value of the property based on application of the *Maryville Properties* method that complies with *Maryville Properties* decision that requires utilization of 'actual interest and capitalization rates.' "

The Commission entered its order affirming the Hearing Officer's decision and adopted and incorporated in its order the Hearing Officer's decision and findings of fact and conclusions of law. The Assessor filed a petition for judicial review of the Commission's order in the circuit court. *See* section 138.470. The circuit court reversed the Commission's decision on the basis that it misapplied the law. This appeal follows. We review the Commission's decision rather than the circuit court's judgment. The Assessor is the "party aggrieved" by the Commission's decision and, as such, the Assessor filed the appellant's and reply brief in this appeal pursuant to Rule 84.05(e).[9]

## Standard of Review

The Western District of this Court recently described our standard of review as follows:

On an appeal from a judgment of a trial court addressing the decision of an administrative agency, we review the decision of the administrative agency and not the judgment of the trial court. *Bird v. Mo. Bd. of Architects,* 259 S.W.3d 516, 520 n. 7 (Mo. banc 2008). Notwithstanding, in our mandate, we reverse, affirm or otherwise act upon the judgment of the trial court. *Id.*

"Pursuant to Mo. Const. art. V, section 18 and section 536.140, we must determine 'whether the agency's findings are supported by competent and substantial evidence on the record as a whole; whether the decision is arbitrary, capricious, unreasonable or involves an abuse of discretion; or whether the decision is unauthorized by law.' " *Henry v. Mo. Dept. of Mental Health,* 351 S.W.3d 707, 712 (Mo.App. W.D.2011) (quoting *Coffer v. Wasson–Hunt,* 281 S.W.3d 308, 310 (Mo. banc 2009)).

. . . .

When an administrative agency decision is based on the agency's interpretation and application of the law, we review the administrative agency's conclusions of law and its decision de novo, and we make corrections to erroneous interpretations of the law. *Algonquin Golf Club v. State Tax Commission,* 220 S.W.3d 415, 418 (Mo.App. E.D. 2007).

9. All rule references are to Missouri Court Rules (2012).

... "This court reviews the decision of the [Commission] and not the hearing officer, *Cohen v. Bushmeyer,* 251 S.W.3d 345, 350 n. 4 (Mo.App. E.D.2008), unless, as here, the [Commission] incorporated the decision of [the] hearing officer, in which case we consider both together, *Loven v. Greene County,* 94 S.W.3d 475, 477 (Mo.App. S.D.2003)." *Peruque, LLC v. Shipman,* 352 S.W.3d 370, 374 (Mo.App. E.D.2011).

*Rinehart v. Bateman,* 363 S.W.3d 357, 362–63 (Mo.App.2012).

## Analysis

The Assessor raises two points on appeal, asserting that (1) the Commission erred "in ruling" that subsidized housing "must be valued using the 'Maryville Formula[,]'" and (2) that the Commission's erroneous use of the "Maryville Formula" to value subsidized housing rather than using those methods used "for other apartments and rental housing" creates a separate subclassification of residential real property in violation of articles III and IV(b) of the Missouri Constitution. The Assessor raised neither of these issues to the Commission and thereby failed to preserve them for our appellate review.

■ "The general rule is that a court should not set aside administrative actions unless the agency has been given a prior opportunity, on timely request by the complainant, to consider the point at issue." *Mills v. Fed. Soldiers Home,* 549 S.W.2d 862, 868 (Mo. banc 1977). This court has applied this rule in an appeal from a decision of the Commission in *Reeves v. Snider,* 115 S.W.3d 375 (Mo.App.2003). We noted that

> Taxpayers never injected the "lack of authority" issue into the case in any fashion before the STC [ (State Tax Commission) ] rendered its decision. They could have injected this "authori-

ty" issue via their petition for review, but failed to do so. They could have objected to the appraisers' testimony and reports on the basis that Snider was never authorized to hire them, but failed to do so. They cannot "sandbag" the assessor, the STC, and this court by raising the issue as a post-hearing matter. Point denied.

*Id* at 380–81. In addition, this rule is implicitly embodied in the statutory requirement that the application for review filed with the Commission, by any party who is subject to a decision and order of a hearing officer, including the assessor, "shall contain specific detailed grounds upon which it is claimed the decision is erroneous." Section 138.432.

■ Just as we would not allow the taxpayers in *Reeves* to sandbag the assessor, the STC, and this court then, we will not allow the Assessor to sandbag PB Associates, the Commission, or this court now. Not once during the hearing did the Assessor raise the issue that the Maryville formula should not be used to value the subject subsidized housing or that its use violated the Missouri Constitution. The Assessor did not object to the testimony by PB Associates' experts purportedly applying the "Maryville Formula" on the basis that the formula was inapplicable or its application was unconstitutional. In fact, the Assessor's own expert in his testimony purported to apply the "Maryville Formula," to the exclusion of any other method for valuing the property. We acknowledge he took this position because the Commission had previously stated in its published decisions that the "Maryville Formula" was the correct methodology to value subsidized housing. *See, e.g., Lake Ozark Village v. Whitworth,* 2004 WL 1172803 (Mo. State Tax Comm'n Apr. 29, 2004) ("In this case, *and all subsequent subsidized housing cases,* the correct methodology for va-

luing subsidized housing projects is the methodology set out in *Maryville Properties.*") (underlined emphasis added). The Assessor, however, did not offer any evidence of any other methodology he claimed should have been used by the Hearing Officer or the Commission. To presume that the Hearing Officer and the Commission would have either rejected such an offer or would not have considered such evidence, if admitted, is nothing but conjecture and speculation.

In addition to not raising these issues during the hearing, the Assessor did not raise either issue in his application for review filed with the Commission, as required by section 138.432. Moreover, the Assessor's petition for review expressly *requests* the Commission to apply the "Maryville Formula." This request directly contradicts the points now raised by the Assessor on appeal that the "Maryville Formula" is inapplicable and unconstitutional. Under section 138.432, the Commission has broad authority to "affirm, modify, reverse, or set aside the decision and order of the hearing officer on the basis of the evidence previously submitted in such case, [to] take additional evidence, or [to] remand the matter to the hearing officer with directions." Section 138.432. The Assessor's failure to raise these issues in his application for review deprived the Commission of these possible actions it could have taken to address the issues now raised for the first time on appeal.

While there may be serious and substantial questions that can be raised about the use of the "Maryville Formula" to value any or all subsidized housing, the Commission should be given a fair opportunity to address them before they are considered on appeal by either a circuit court or an appellate court. Raising these questions before the Commission gives it the oppor-

tunity to develop an appropriate record to fully consider them and, if necessary, to support appropriate appellate review of its answers.

Because the Assessor's claims of Commission error were not raised to the Commission, they were not properly preserved for appellate review. In the absence of any preserved error, the Commission's decision and order must be affirmed. Therefore, the judgment of the circuit court, which reversed the decision of the Commission and remanded the cause for reconsideration, is reversed.

DON E. BURRELL, P.J., concurs.

NANCY STEFFEN RAHMEYER, J., dissents in separate opinion.

NANCY STEFFEN RAHMEYER, J.

I respectfully dissent because I believe the majority opinion overlooks three important points. In his first point, the Assessor asserts the Commission erred "in ruling" that subsidized housing "must be valued using the 'Maryville formula'" because (a) "the formula is based on the income approach only," (b) the formula uses "actual rents," and (c) the use of "market rather than actual capitalization rates" is improper. I believe the Assessor preserved the third subpart of his first point relied on for appellate review. In this third subpart, the Assessor claims that the Commission erred "in ruling" that subsidized housing "must be valued using the 'Maryville formula'" because the use of "market rather than actual capitalization rates" is improper. As the majority notes, the Assessor raised this claim in his application for review by the Commission. As more fully described below, I believe the Assessor's preserved claim is correct in the circumstances of this case.[1]

---

1. If I am wrong that this claim was preserved      for appellate review, I still believe the claim

Second, the majority opinion ignores the following legal principles. "Determining the true value in money *is an issue of fact* for the [State Tax Commission,]" *Cohen v. Bushmeyer*, 251 S.W.3d 345, 348 (Mo.App. E.D.2008), but determining "[w]hether the appropriate standard of value and approach to valuation were properly applied under the particular facts and circumstances of the case is a question of law." *Snider v. Casino Aztar*, 156 S.W.3d at 346. The "[State Tax C]ommission has some discretion in deciding which approach best estimates the value of a particular property," but its "choice of valuation approaches must comply with the law," and "[o]nce [it] decides to use a particular approach, it must apply that approach properly and consider all of the factors relevant to that approach." *Id.* at 348 (citation omitted). Further, in the context of a commercial property that was subject to a long-term lease requiring rent that was below current market rent, the Missouri Supreme Court in *Missouri Baptist Children's Home v. State Tax Commission of Missouri*, 867 S.W.2d 510 (Mo. banc 1993), held that:

> The more recent and better-reasoned approach is to authorize the assessing authority to utilize actual as well as potential income in determining true value.
>
> . . . .
>
> Placing a value on real property is not an exact science. When relying on the

income capitalization method to determine value, the factfinder necessarily has some discretion to decide what weight will be given to actual rent, as opposed to potential market rent, in reaching its decision. Where the lease was prudent when entered into, the Commission is quite correct to consider actual rent as a factor in determining the value of the property under the income capitalization method.

*Id.* at 512, 513. The Supreme Court, however, specifically noted: "At the same time, projected actual income may be adjusted to reflect current market conditions where actual rent substantially distorts the property's true value. In fact, circumstances may exist where the income capitalization method is too vague or speculative to be a reliable measure of value." *Id.* at 513.[2]

Third, the majority opinion ignores the burden of proof before the Commission and the consequence of the parties' failure to present appropriate evidence of value. A county board of equalization's valuation is presumed correct, and the presumption may be rebutted only if the taxpayer presents substantial and persuasive evidence that the valuation is erroneous. The taxpayer has the burden to establish the value that should have been placed on the property. *See Snider v. Casino Aztar*, 156 S.W.3d 341, 346 (Mo. banc 2005).[3]

should be reviewed because a failure to review this claim might result in injustice. *See Blevins Asphalt Construction Co. v. Director of Revenue*, 938 S.W.2d 899, 902–03 (Mo. banc 1997) ("Generally, administrative actions should not be set aside without an opportunity for the agency, on timely request by the complainant, to consider the issue, unless injustice might otherwise result.")

2. *See also Nance v. State Tax Commission of Missouri*, 18 S.W.3d 611, 617–20 (Mo.App. W.D.2000) (for examples of leases where ac-

tual rent substantially distorted the true value of the real property at issue).

3. In its opinion, the Supreme Court used the phrases "tax assessor's valuation" and "assessor's valuation" rather than the phrase "county board of equalization's valuation." I interpret the Supreme Court's opinion to mean a county board of equalization's valuation in view of the legislature's 1992 statutory abolition of a presumption in favor of the assessor. *See Rinehart v. Bateman*, 363 S.W.3d 357, 2012 WL 538954 at *7; *Cohen v. Bushmeyer*, 251 S.W.3d 345, 348 & n. 2 (Mo.

Analyzed under these principles, I believe the Assessor's preserved claim is correct.

In this case, the Assessor classified the subsidized duplexes as residential property, and PB Associates does not dispute that classification. For real property classified as residential property, section 137.115.1 and 137.115.5(1), RSMo Cum. Supp.2005, requires that the property be assessed at nineteen percent of its "true value in money" on January 1 of each odd-numbered year. True value in money is the fair market value of the property (i.e., the price a willing buyer would pay a willing seller). *Cohen v. Bushmeyer*, 251 S.W.3d 345, 348 (Mo.App. E.D.2008). There is no separate classification, or exemption from property tax, for privately-owned, subsidized, residential housing.

Experts for both PB Associates and the Assessor used a modified income approach to value the subsidized housing in question based on the Commission's administrative decisions in *Maryville Properties, L.P. v. Nelson*, 2000 WL 509484 (Mo. State Tax Comm'n Apr. 27, 2000), as modified by *Maryville Properties, L.P. v. Nelson*, 83 S.W.3d 608 (Mo.App. W.D.2002), and in *Lake Ozark Village v. Whitworth*, 2004 WL 1172803 (Mo. State Tax Comm'n Apr. 29, 2004). The modified income approach uses "actual income, expenses and financ-

ing terms" for the subsidized property, "an appropriate equity dividend rate," and "taxes should be included in the capitalization rate." *Maryville Properties*, 2000 WL 509484 at *5. The fundamental difference between the experts was that the experts for PB Associates believed "an appropriate equity dividend rate" required the use of a market equity dividend rate equal to 9% based on sales of non-subsidized or "conventional" apartments with upward adjustments for "marketability," "illiquidity" and a debt to equity ratio of 20 to 80 percent, while the expert for the Assessor believed "an appropriate equity dividend rate" required the use of the actual equity dividend rate for the specific subsidized duplexes at issue in the amount of .3952%. In view of the fact the equity for the duplexes was 81.5%, the difference in equity dividend rates made a large difference in value. The Hearing Officer and Commission adopted the view of the experts for PB Associates with the exception that the Hearing Officer and Commission eliminated the upward adjustments for marketability and illiquidity and determined the equity dividend rate to be 8.375%.[4]

I believe the Commission's administrative decision in this case is unauthorized by law in that it misapplied the law. First, by

App. E.D.2008); *see also Reeves v. Snider*, 115 S.W.3d 375, 379–80 (Mo.App. S.D.2003) (the taxpayer, as the party seeking affirmative relief before the State Tax Commission, bears the burden of proof regardless of the existence or not of a presumption in favor of county boards of equalization).

4. I note that, in past administrative decisions, the Commission has described this valuation approach in terms that could lead to a different conclusion. In both *Lake Ozark Village* and *Sixth Street Partners v. Koons*, 2007 WL 2823435 (Mo. State Tax Comm'n September 14, 2007), the Commission indicated the *Maryville Properties* modified income approach

utilizes "actual income, actual expenses, and actual interest and capitalization rates." *Lake Ozark Village*, 2004 WL 1172803 at *9; *Sixth Street Partners*, 2007 WL 2823435 at *4. *Sixth Street Partners* subsequently states "[s]omeone familiar with the process of determining capitalization rates must review the market and estimate the appropriate capitalization rate for the equity portion of this equation," but does not clarify whether the "market" referred to is the market for subsidized housing or is some broader market like the market for conventional, multi-family housing. *Sixth Street Partners*, 2007 WL 2823435 at *5.

mixing a market equity dividend rate of 8.375% based on non-subsidized housing with the actual income, expenses, and interest rates for the 81.5% equity-financed, subsidized duplexes at issue, the Commission's decision "substantially distorts" the true fair market value of the duplexes. The distortion is evidenced by (1) the Assessor's expert's opinion that the actual equity dividend rate for the duplexes was less than 1%, and (2) the common sense notion that subsidized duplexes completed in 2006 at a cost of $4,324,356 likely had a fair market on January 1, 2007, significantly greater than $888,300.[5]

Second is that, as PB Associates appears to acknowledge in its brief, the LUR agreement that encumbers the duplexes was not prudent at the time PB Associates entered into the agreement in 2006 but for the federal and state income tax credits PB Associates received in exchange for the LUR agreement. Yet, the actual revenue PB Associates received from the sale of limited partnership interests that entitled the purchasers to the tax credits and that was used to construct the duplexes, was not included (either in whole or in part prorated over the life of the tax credits that generated the revenue) in the actual income utilized to determine the duplexes'

fair market value under the modified income approach used by the Commission. In the circumstances of this case, I believe the actual revenue received from the sale of the limited partnership interests in economic reality is (1) a substitute for the market rent that PB Associates agreed to forego in exchange for the tax credits under the LUR Agreement, and (2) the functional, economic equivalent of prepaid rent. The failure to include in some manner the "prepaid rent" in the actual rent followed by the application of a market equity dividend rate for non-subsidized housing to the actual net operating income of the subsidized duplexes, further distorts the true fair market value of the duplexes, and makes the Commission's modified income approach too vague and speculative to be a reliable measure of the subsidized duplexes' fair market value on January 1, 2007.[6]

Third is that the Commission ignored evidence that strongly indicates its modified income approach in which it applied a market equity dividend rate for non-subsidized housing to the actual net operating income for subsidized housing, is an inappropriate approach to determining the fair market value of the subsidized duplexes at issue here. All experts noted the lack of

**5.** In *Lebanon Properties I v. North*, 66 S.W.3d 765, 769–70 (Mo.App. S.D.2002), we denied a taxpayer's claim of Commission error in the determination of an "equity rate" for subsidized housing that appears to be a market based rate. It is unclear from the opinion what market, if any, was used. Even if a market was used, and that market was for conventional, multi-family housing, our decision in *Lebanon Properties* provides little guidance here because (1) the claim in *Lebanon Properties I* was different than the claim raised here, (2) the taxpayer's equity apparently was only 20%, and (3) *Lebanon Properties I* was decided before the Missouri Supreme Court's decision in *Snider v. Casino Aztar*.

**6.** In *Maryville Properties, L.P. v. Nelson*, 83 S.W.3d 608 (Mo.App. W.D.2002), the Western District held that the value of remaining tax credits could not be included in the true value in money of the subsidized housing that gave rise to the credits because the credits were intangible personal property. I believe including at least a prorated part of the actual revenue received from the sale of limited partnership interests in the actual income generated by the subsidized housing for purposes of applying a modified income approach to valuing the subsidized housing is a different issue and may be appropriate. If I am wrong, I still am left with the belief that the Commission's modified income approach is too vague and speculative to be a reliable measure of value.

sale comparables, and none presented any evidence of income, expense, or equity dividend rate comparables for subsidized housing. In addition, the duplexes (1) were completed at a cost of $4,324,356 less than one year before the valuation date, (2) were financed with 81.5% equity, and (3) were restricted to a special use with below-market rental rates in exchange for significant federal and state income tax credits the revenue from the sale of which (through the sale of limited partnership interests) was not taken into account by the Commission under its modified income approach. In these circumstances, the Commission should have considered other valuation approaches to determining the fair market value of the subsidized housing at issue. *See Snider v. Casino Aztar,* 156 S.W.3d 341, 349–50 (Mo. banc 2005).

Finally, I believe the Commission's decision to only apply the "income approach" was, and is, based on a misreading of *Maryville Properties, L.P. v. Nelson,* 83 S.W.3d 608 (Mo.App. W.D.2002), and *Missouri Baptist Children's Home.* The decision by the Commission to apply a "hybrid" income analysis approach has never been challenged on appeal. Both experts testified that this approach is used exclusively only for subsidized housing assessments and the Commission has decreed that this is the only approach that will be considered. It would have been wasted effort to prepare an analysis using a different method in front of the Commission. The result is that an apartment complex that cost $4,324,356 to build, and which encompasses forty units, an office, community room, and covered surface parking on 7.33 acres, is valued at $888,300. An injustice has occurred by using the vague and speculative method used by the Commission.

As a result of these misapplications of the law by the Commission and PB Associ-ates' failure to present evidence of the duplexes' fair market value under an appropriate valuation approach, PB Associates failed, as a matter of law, (1) to present substantial and persuasive evidence that the Board of Equalization's valuation was erroneous, and (2) to meet its burden to establish the value that should have been placed on the duplexes. *Snider v. Casino Aztar,* 156 S.W.3d at 349–51; *see also Drury Chesterfield, Inc. v. Muehlheausler,* 347 S.W.3d 107, 112, 114–15 (Mo. App. E.D.2011) (discussing *Snider v. Casino Aztar* in the context of an unfinished hotel, and concluding that the taxpayer failed to overcome the presumption the county board of equalization's valuation was correct—the opinion uses the phrase "[a]ssessor's valuation," but again I interpret the Eastern District's opinion to mean "county board of equalization's valuation").

I believe the judgment of the circuit court, which reversed the decision of the Commission and remanded the cause for reconsideration, should be affirmed, but with directions that the Commission affirm the Board of Equalization's determination that the subsidized duplexes' true value in money on January 1, 2007, was $2,668,060.