PER CURIAM.
Rick Parker, the Assessor for Reynolds County ("Assessor"), appeals from the findings of the State Tax Commission ("the Commission") regarding the valuation of real property in Reynolds County.[1] The Commission found that the fair market value on January 1, 2011, of a part of Taxpayer's real property in Reynolds County was $105,600,000 for property tax purposes. Assessor brings five points claiming the Commission erred in determining the fair market value of the real property at issue before the Commission. We disagree, but first, we must address procedural issues.
Serious and unexcused deficiencies in all of Assessor's points warrant dismissal of this appeal. Assessor's disregard of Rule 84.04(d) seriously impedes our review of his complaints.[2] Although blessed with talented *359 and experienced counsel, Assessor made no attempt to comply with Rule 84.04(d)(2) in any of his points; offered no excuse, explanation, or remedy when Taxpayer properly cited these failings in its brief; and seemed not to fathom this Court's requests for clarification during oral argument.
"Failure to properly state the points relied on indicates a lack of understanding of the appellate function and process." Thummel v. King , 570 S.W.2d 679, 686 (Mo. banc 1978). Here, we do not evaluate evidence and make an original tax determination; rather, we consider assertions that the Commission erred so as to entitle Assessor to relief from the Commission's determination. See id. Thus, "[t]he requirement that the point relied on clearly state the contention on appeal is not simply a judicial word game or a matter of hypertechnicality on the part of appellate courts." Id.
Rule 84.04(d) compliance is particularly critical "in a case such as this where the facts are complex." Id. Because Assessor's briefs do not adequately advise this Court of the contentions asserted or merit thereof, we face the dilemma of deciding this case (and possibly establishing future precedent) on the basis of inadequate briefing and advocacy. Id. "In addition to being inherently unfair to the other party to the appeal, it is unfair to parties in other cases awaiting disposition because it takes from them appellate time and resources which should be devoted to expeditious resolution of their appeals." Id.
The violations here-every single point-are particularly egregious because Rule 84.04(d) includes specific point templates, so Assessor "simply ha[s] no excuse for failing to submit adequate points relied on." Scott v. King , 510 S.W.3d 887, 892 (Mo. App. E.D. 2017). "Insufficient points relied on preserve nothing for appellate review and constitute grounds for dismissal." Parker v. Action Contracting Corp ., 100 S.W.3d 168, 171 (Mo. App. W.D. 2003).
Assessor's serious and unexcused Rule 84.04(d) violations warrant dismissal. We decline to do so only because:
[t]his type of case is by its very nature impressed with a public interest; substantial business and private interests and investments are involved; and, this [C]ourt is reluctant to forgo its judicial function to decide the matter on the merits, because of a failure of counsel to obey the mandate of the Rule.
State ex rel. Oliver v. Pub. Serv. Comm'n , 542 S.W.2d 595, 597 (Mo. App. K.C.D. 1976).
Yet this grants Assessor only a fleeting reprieve because each of his points ostensibly challenges the sufficiency or weight of the evidence.[3] No such challenge can succeed on appeal unless it substantially tracks the rubric first set out in Houston v. Crider , 317 S.W.3d 178, 186-87 (Mo. App. S.D. 2010), and followed in scores of reported opinions since.[4] Assessor disregards *360 the format for asserting such complaints, which renders all such arguments analytically and persuasively worthless.[5] This means, in turn, that for this Court to grant any of Assessor's points, we would have to develop and support our own Houston argument in Assessor's favor, which "would thrust us into becoming an advocate on [Assessor's] behalf; a role we are prohibited from assuming." Id. at 189.
The foregoing, of necessity, would end our inquiry in most cases. But again, this case "is by its very nature impressed with a public interest." Oliver , 542 S.W.2d at 597. For that reason alone, this Court has attempted to overcome Assessor's otherwise-fatal deficiencies, address each of his points on appeal below, and determine whether any could properly merit relief.
Standard of Review
We can grant Assessor relief only if the Commission's decision:
(1) is in violation of constitutional provisions; (2) is in excess of the statutory authority or jurisdiction of the agency; (3) is unsupported by competent and substantial evidence upon the whole record; (4) is, for any other reason, unauthorized by law; (5) is made upon unlawful procedure or without a fair trial; (6) is arbitrary, capricious or unreasonable; or (7) involves an abuse of discretion.
Bateman v. Rinehart , 391 S.W.3d 441, 444-45 (Mo. banc 2013) (quotation and citations omitted); see also section 536.140, RSMo Cum.Supp. 2005, and Mo. Const. art. V, section 18. This Court is hesitant to substitute its judgment for the Commission in matters of property tax assessment. Bateman , 391 S.W.3d at 445. "This Court will defer to the [Commission's] judgment regarding factual matters; however, the [Commission's] decision interpreting statutory law is reviewed de novo and will be upheld only when its decision is authorized by law and supported by competent and substantial evidence upon the record." Id.
A county board of equalization's valuation is presumed correct; the presumption may be rebutted only if the taxpayer presents substantial and persuasive evidence that the valuation is erroneous. Snider v. Casino Aztar , 156 S.W.3d 341, 346 (Mo. banc 2005). The taxpayer has the burden to establish the value that should have been placed on the property. Id.[6] Determining the true value in money is an issue of fact for the Commission, Cohen v. Bushmeyer , 251 S.W.3d 345, 348 (Mo. App. E.D. 2008), but determining "[w]hether the appropriate standard of *361 value and approach to valuation were properly applied under the particular facts and circumstances of the case is a question of law." Snider v. Casino Aztar , 156 S.W.3d at 346. While the Commission has some discretion in deciding which approach best estimates the value of a particular property, its choice of valuation approaches must comply with the law, and once the Commission decides to use a particular approach, it must apply that approach properly and consider all of the relevant factors. Id. at 348.
Commission Findings
Taxpayer is a mining company that owns, or leases from the federal Bureau of Land Management ("BLM") and other private persons, 39,221 acres in Reynolds County that are identified as 234 separate parcels for ad valorem tax purposes.[7] The land is part of three separate mines-Brushy Creek Mine, Fletcher West Fork Mine and Sweetwater Mine.[8] The mineral lease payments under Taxpayer's leases are in the form of royalty payments. The royalty payments are 5% of net smelter returns. Net smelter returns are the net revenue from Taxpayer's sales of lead, zinc and copper concentrates. The parties agreed that the royalty payments are at market rate.
The Commission determined an aggregate true value in money of $105,600,000 for the five parcels at issue in the proceedings before the Commission.[9] The Commission further found and concluded that mining properties are complex to value and may not lend themselves to the development of a single approach for valuing the property for ad valorem purposes. Specifically, the cost approach could not be used to value the property in its entirety because of the nature of mineral leases. Because of the unique nature of mines and quarries, which are seldom alike as they differ in ore, reserves, size, geology, depth, costs, and location, the sales comparison approach alone was not adequate. The Commission noted caution should be exercised when valuing mining property using the income approach as it may capture income earned from the personal property or intangibles.
Both parties developed all three approaches to value; the parties developed *362 those approaches differently. For example, Taxpayer developed a commercial property sales comparison approach to value the land and improvements but used the royalty income approach to value the mineral interest. Assessor utilized a unitary income approach to value all of the property belonging to Taxpayer. Assessor's income approach was based upon income generated by the production of the concentrates and therefore included income from the entire mining operation-real property, personal property and intangibles. The Commission found the most persuasive approach as to the improvements was Taxpayer's approach as it valued the improvements using the sales comparison approach and cost approach. Taxpayer properly classified the surface land owned by Taxpayer as commercial. Assessor's evidence as to the market value of land in Reynolds County of $700 per acre was substantial and persuasive. The market valuation of the land using Taxpayer's acreage figure was determined to be: $700 per acre times 20,556.48 acres equals $14,390,000 (rounded).[10]
Taxpayer's appraiser opined that the improvements had a value of $1,272,852 under the sales comparison approach and $1,179,890 under the cost approach. Assessor's appraiser countered that at least a portion of the improvements had a value of $13,727,912 under the cost approach.
The Commission used Assessor's appraisal to review Taxpayer's appraisal and noted Taxpayer's appraiser did not include a valuation determination for all improvements in his appraisal. As the appraiser testified, many of the improvements would have been implicitly included in his valuation. Those improvements would have included roads to access buildings, etc. Some improvements such as tailing ponds and dams were not valued. According to Taxpayers' appraiser, the value of those improvements would have been negated by the remediation costs. There were improvements such as fixtures that were not valued and should have been included. Further, the appraiser should have included such items as the construction work in progress and presented a supportable position as to their market value, or stated why those item do not have a market value. These items were not maintenance of the improvements, but betterment in which the owner anticipated deriving a financial reward. Assessor's appraiser made a determination of value for the construction work in progress at each mine ($6,058,105, $7,200,258, and $3,007,691, or a total of $16,266,054). The Commission concluded Taxpayer failed to present evidence to refute the determinations made by Assessor.
After review of the appraisal approaches and the evidence presented as to the improvement value as opined by Taxpayer's appraiser and the construction work in progress values as opined by Assessor's appraiser, the Commission determined the valuation of the improvements to be *363 $17,540,000 (rounded).[11]
The Commission further found as follows. With respect to Taxpayer's mineral interests, Taxpayer not only owned real property with the entire "bundle of rights" but also had interests in mineral rights in land belonging to others. Mineral interests are classified as real property, and are taxed based on the appraised fair market value. In its simplest form, fair market value is the price a willing buyer from the open market will pay for a mineral interest within the currently prevailing market conditions. Taxpayer's appraiser developed an opinion of value of the leased mineral rights utilizing the Royalty Income Approach. Royalty income is based on a lease agreement in which the property owner is paid for the right to explore for mineral bodies and extract ore. General accepted appraisal procedure is to value royalty income or the receivable from the mineral estate thereby excluding the value of the business of extraction (also known as benefication of minerals). The royalty stream is capitalized for an indication of value. The appraiser used discounted cash flow and the direct capitalization methods. The appraiser used the actual lease payments in place when valuing Taxpayer's leased mineral rights; the royalty rate is 5% of value to the lessee or 5% of the net smelter return. The royalty rate was utilized to value the mineral rights leased from the privately owned properties. Royalty fees were imputed to land owned by Taxpayer in fee simple to opine a value for the mineral rights of those properties.
The Commission determined Taxpayer's methodology was substantial and persuasive as it relied more heavily on historical information of the property and it required less subjective determinations and adjustments. The royalty rate was based upon mineral leases in place and actual market rates. Taxpayer's method provided for supportable segregation of the mineral rights value from the value of the enterprise producing the minerals and concentrates.[12] In other words, capitalizing the royalty income stream captured only the income attributable to the mineral estate without capturing any of the business enterprise *364 value attributable to the extraction of the mineral estate. Capitalizing the net operating income stream resulting from mining, handling, milling and concentrating the ore would necessarily capture business enterprise value. Personal property including severed ore, stockpiles, rolling stock and equipment and the income generated from those items should not be included in this valuation. The valuation of those items and the property tax paid on those items were not appealed and not subject to this valuation.
Nevertheless, the Commission rejected Taxpayer's use of discounted cash flow as problematic in that it requires additional assumptions and subjective determinations by the appraiser. The subjective determinations include the price of the various metals over the period of the mine. The evidence was that the price was difficult to establish and estimate. The Commission further cited one court's holding, "The DCF method, as applied to tax valuation proceedings, is an amalgam of interdependent, attenuated assumptions of limited probative value." University Plaza Realty Corp. v. City of Hackensack , 12 N.J. Tax 354 (N.J. Tax 1991), aff. 264 N.J.Super. 353, 624 A.2d 1000 (App. Div. 1993). The Commission found that, in short, there is a great deal of guesswork that goes into a discounted cash flow analysist. The fact that some investors rely on this methodology does not increase its accuracy or reliability.
The Commission found the direct capitalization approach was an appropriate and persuasive approach to capture the true value of a property on the statutorily set valuation date-January 1, 2011. To estimate value with direct capitalization, a property's stabilized net operating income ("NOI") is divided by the market capitalization rate. Taxpayer's appraiser estimated the royalty income as to each mine as follows:
Brushy Creek $341,808[13] Fletcher/West Fork $3,794,747 Sweetwater $2,124,675
[Editor's Note: The preceding image contains the reference for footnote[13] ].
The next step used by the Commission applied the appropriate capitalization rate. As the Commission stated, Taxpayer's appraiser developed his direct capitalization rate after deriving his discount rate for his discounted cash flow, i.e., the direct capitalization rate was developed mathematically from the discount rate. His discount rate was developed using the weighted average cost of capital ("WACC"). The Commission found the WACC may not accurately reflect the royalty position because the royalty position has a lower risk. The evidence established that the orebody would be sustained for additional decades. The replacement of mined ore by exploration would extend the life of the mine *365 thereby reducing the risk and should be reflected in the capitalization rate.
The evidence presented to the Commission established that Taxpayer's appraiser overestimated the risk. Testimony and exhibits indicated that the orebody reserves and revenues are anticipated for 30 years. Further, the rate selected by the appraiser had not been sufficiently supported by any market information. The Commission was not persuaded by the testimony of the witness that the capitalization rate developed and presented is appropriate. Their review of the market, government, industry information presented in both appraisals as well as the evidence presented regarding the property provided ample evidentiary basis for development of a capitalization rate of 8.5%. The value of the mineral interest property was determined to be $73,660,000 (rounded).[14]
By the terms of its decision, the Commission did not apply the direct capitalization method to value Taxpayer's mineral interests in BLM land under its leases with BLM. The Commission did affirmatively determine that Taxpayer's mineral leases with BLM required a market royalty rate and, as a result, did not have any value independent of the value of the right to explore for and extract minerals from BLM's land.
The Commission further found it was not presented with substantial and persuasive evidence of the entirety of the property as an assemblage and with a determination of allocation of the market value to the appealed assets as was true in Doe Run Company v. Holman , 1999 WL 1253948 (MTC 1999), where 235 acres with a lead smelter plant was valued as part of "an entire lead producing company" and 25% of the "going concern" value was allocated to the land and plant. The Commission specifically rejected Assessor's "unitary" or "Arizona method" for several reasons. The Commission noted that it was not clear what was included in the valuation or how the depreciation was determined. Further, the State of Arizona's Appraisal Manual for Centrally Valued National Resource Property is not recognized as an authoritative manual for appraisal practice and was designed for a particular state. The Commission stated that it was unknown if their natural resource mining property have any similarities or comparability to the mining on-going at the subject property. It was unknown if they are processing and manufacturing property and unknown if the states ad valorem taxations are similar.
Point I-The Commission erred by failing to value the three (3) mine and mill units according to their highest and best use. It determined, unsupported by competent and substantial evidence, that general industrial warehouses, retail, and manufacturing buildings are the reasonably probable, appropriately supported, and financially feasible use of the subject properties on January 1, 2011. The uncontroverted evidence presented by both parties is that the subject properties would have been purchased for and continued as mine and mill units s [sic] of tax day. Where the Commission makes findings of fact that disregarded overwhelming evidence to the contrary, the Commission's decision is unlawful, unfair, improper, arbitrary, capricious, unreasonable, an abuse of discretion, and contrary to Missouri law.
From its point, the underlying premise is that the Commission simply valued the three mines by using a comparable *366 sales approach. We reject this claim because the claim fails to recognize what the Commission actually decided. After noting that mining properties are complex to value and may not lend themselves to the development of a single approach for valuing the property for ad valorem purposes, the Commission determined that Assessor used an approach for valuing the property that was not accepted as authoritative by the Commission. In effect, the Commission combined Taxpayer's income and cost approaches for building comparables that were not suitable for underground mining with Assessor's cost approach for at least a portion of the improvements at issue in this proceeding and with Assessor's critique of Taxpayer's approaches to reach a valuation for the improvements at issue. The valuation of $17,540,000 exceeded (1) Taxpayer's income and cost approach valuations by more than $16,200,000, and (2) Assessor's cost approach valuation for at least a portion of the improvements at issue by more than $3,800,000.
We cannot say as a matter of law that the Commission erred in utilizing Taxpayer's income and cost approaches as corrected based on Assessor's critique of the approaches to value Taxpayer's improvements at issue in this proceeding at a true value in money of $17,540,000. Assessor does not challenge in this point the methods and made no effort to show that as a matter of law the Commission could not use these methods. If, on the other hand, Assessor intends this point to be construed as challenging the sufficiency of the evidence as opposed to a challenge to the approach to valuation, we also conclude that, considering the whole record, there was sufficient competent and substantial evidence to support this valuation.
Point I is denied.
Point II-The Commission erred in failing to value to the subject properties as an assemblage when the only evidence in the Record is that each mine and mill functions as an [sic] unit. There was no evidence presented to the contrary. There is no evidence that a market exist for standalone, unconnected and separate individual components of an operating mine and mill. Where the Commission completely disregarded a fact in the face of overwhelming evidence and case law to the contrary, the Commission's decision is unlawful, unfair, improper, arbitrary, capricious, unreasonable, an abuse of discretion, and contrary to Missouri law.
We reject this claim. First, we note that this claim is also not a "substantial evidence" claim as asserted in oral argument. In actuality, this point appears to challenge the Commission's refusal to use Taxpayer's "unitary approach." This claim is a challenge to the appropriate standard of value and approach to valuation and is reviewed as a matter of law. As noted in our analysis above, the Commission rejected Assessor's unitary or assemblage income approach (or Arizona approach) because the Commission concluded, in the circumstances of this proceeding, that Assessor had not properly accounted for income attributable to personal property, intangibles and other property not included in the appeal. We cannot say as a matter of law that the Commission erred in rejecting the unitary or assemblage income approach in the circumstances of this case.
Point II is denied.
Point III-The Commission erred in its determination of the true value in money and assessed value for the subject properties because it failed to include significant portions of [Taxpayer's] real property and mineral interests owned by Doe Run without any reasonable explanation *367 or support in the Record. Where the Commission fails to value significant portions of the property under appeal, the Commission's decision is unlawful, unfair, improper, arbitrary, capricious, unreasonable, and abuse of discretion, and contrary to Missouri law.
Again, we are left to guess what significant real property and mineral interests were not valued without a reasonable explanation or support in the record. From the argument, we glean it may be underground improvements and some surface improvements. This claim also fails. Although the Commission did not specifically ascribe a separate value to "underground improvements" that Assessor asserted had significant value, it is apparent that the Commission likely accepted Taxpayer's argument that these "improvements" did not add any value to the land and simply were holes created in the subsurface terrain in order to access the ore bodies and extract ore with the cost of the holes simply being ordinary and necessary mining expenses (not capital costs), and, to the extent those expenses did add value to the land, likely accepted Taxpayer's appraiser's opinion that the value was included in Taxpayer's income approach to valuing the ore bodies.
The Commission did note in its decision that Taxpayer's appraiser did not value some improvements including "fixtures that were not valued and should have been included" before increasing Taxpayer's advocated value for the improvements by more than $16,200,000 for "construction work in progress at each mine" in response to Assessor's critique of Taxpayer's appraisal. The Commission likely believed this adjustment was adequate to correct for any omissions by Taxpayer's appraiser that actually would have increased the value of Taxpayer's improvements.
Considering the whole record, there was sufficient competent and substantial evidence to support the Commission's valuation of the improvements as a valuation of all improvements with appreciable value.
Point III is denied.
Point IV-The Commission's failure to value [Taxpayer's] rights and interest in ore body under the BLM violates RSMo § 259.220 and is arbitrary, capricious and unreasonable.
First, we note that this is also not a claim regarding substantial evidence, but, more importantly, we are unable to review this point because of the stipulation made before the Hearing Officer:
[Attorney for Taxpayer]: Your Honor, in addition to that note, the parties have also reached a stipulation on a number of issues. Those stipulations are being typed, but I would like to give a brief synopsis of it.
The parties have stipulated that complainant leases real property from the Bureau of Land Management which is included in the parcels that we're dealing with today. Complainant leases real property from private land owners. All Bureau of Land Management property is exempt from ad valorem taxes. None of the complainant's leases have any bonus value.
....
[Hearing Officer]: ... Does the County agree with those proposed stipulations?
[Attorney for Assessor]: Yes. Those are the facts that are not in dispute.
In addition, Assessor's appraiser specifically noted with respect to each mine and mill unit the appraiser valued under the unitary income approach that:
Because a market derived royalty rate is used in this report, [Taxpayer's] leasehold interest in the ore body has no *368 calculable value, and the value of the [lessor's] leased fee interest in the ore body is equal to a theoretical fee simple value for the ore body as if it was [or "is"] a stand-alone interest.
Point IV is denied.[15]
Point V-The Commission's failure to conclude to true value in money for any of the subject tax parcels under appeal is a failure of duty and is arbitrary, capricious and unreasonable.
The point appears to state that the Commission failed to give a true value to any of the tax parcels but we believe the complaint is that the Commission erred in failing to determine the true value of each of the five real estate parcels separately. Again, the parties' stipulations cause Assessor's point of error to fail. The parties announced to the Hearing Officer at the beginning of the hearing that there were five appeals but the appeal numbers were not reflective of all parcels under appeal and the valuation of all of the non-appeal parcels would be attributed to these appeals. The Hearing Officer asked:
And ultimately all these parcels are going to have to be divided out for the various school districts, their proportionate share of whatever happens. Is the County prepared, I assume they have been doing this somehow in the past, but are they prepared to do that now or are they expecting the tax commission to try to figure it out?
Assessor's attorney answered: "We will endeavor to do it, and it has not yet been accomplished." The Hearing Officer responded: "Okay. If you want us to do it, it's going to take a lot longer than three or four days to work this out." From the parties' positions before us, perhaps the parties are unable to accomplish voluntarily what Assessor indicated he would endeavor to do. What is clear is that Assessor claimed that Assessor would divide the parcels for the various school districts. We cannot convict the Commission of error for failure to allocate among the 234 parcels when it was not asked to do so.
Point V is denied.
The judgment of the circuit court is reversed and remanded with directions to affirm the decision of the Commission.

Doe Run Company ("Taxpayer") actually appeals from the circuit court's reversal on multiple grounds of the Commission's determination; however, because we review the Commission's decision rather than the circuit court's judgment and because Assessor is the "party aggrieved" by the Commission's decision, Assessor filed the appellant's and reply brief in this appeal, pursuant to Rule 84.05(e). All rule references are to Missouri Court Rules (2017).

That rule required Assessor, in each point relied on, to:
(A) identify the administrative ruling or action that Assessor challenged;
(B) state concisely the legal reasons for Assessor's claim of reversible error; and
(C) explain in summary fashion why, in the context of the case, those legal reasons supported the claim of reversible error.
Rule 84.04(d)(2). The rule also includes a point template that Assessor was required to substantially follow, i.e. :
The Tax Commission erred in [identify the challenged ruling or action ], because [state the legal reasons for the claim of reversible error, including the reference to the applicable statute authorizing review ], in that [explain why, in the context of the case, the legal reasons support the claim of reversible error ].
Id.

As Assessor vigorously and repeatedly confirmed in reply to this Court's repeated questions at oral argument.

Including opinions, like this one, reviewing administrative-agency decisions. See Nichols v. Belleview R-III School District , 528 S.W.3d 918, 927-28 (Mo. App. S.D. 2017) ; Lankford v. Newton County , 517 S.W.3d 577, 585-86 (Mo. App. S.D. 2017) ; Gonzales v. Butterball, L.L.C. , 457 S.W.3d 880, 888 (Mo. App. S.D. 2015) ; Gonzales v. Butterball, L.L.C. , 457 S.W.3d 363, 367 (Mo. App. S.D. 2015) ; Payne v. Treasurer of State, Custodian of Second Injury Fund , 417 S.W.3d 834, 848 (Mo. App. S.D. 2014) ; Jordan v. USF Holland Motor Freight, Inc. , 383 S.W.3d 93, 95 (Mo. App. S.D. 2012).

Nichols , 528 S.W.3d at 928 ; Lankford , 517 S.W.3d at 586 ; Gonzales , 457 S.W.3d at 888 ; Houston , 317 S.W.3d at 188, 189.

In its opinion, the Supreme Court used the phrases "tax assessor's valuation" and "assessor's valuation" rather than the phrase "county board of equalization's valuation." We interpret the Supreme Court to mean a county board of equalization's valuation in view of the legislature's 1992 statutory abolition of a presumption in favor of the assessor. See Rinehart v. Bateman , 363 S.W.3d at 367 ; Cohen v. Bushmeyer , 251 S.W.3d 345, 348 & n.2 (Mo. App. E.D. 2008) ; cf. Union Electric Co. v. Estes , 534 S.W.3d 352, 377 (Mo. App. W.D. 2017) (noting that "[t]o date, Missouri courts have generally concluded that the presumption in favor of the assessed value fixed by a board of equalization remains intact," but finding it unnecessary to decide whether the presumption applied because evidence rebutted the presumption); see also Reeves v. Snider , 115 S.W.3d 375, 379-80 (Mo. App. S.D. 2003) (the taxpayer, as the party seeking affirmative relief before the State Tax Commission, bears the burden of proof regardless of the existence or not of a presumption in favor of county boards of equalization).

There has been no challenge to the non-valuation facts as found by the Commission. Taxpayer owns "over 20,000 acres" in fee simple. Taxpayer leases land primarily from the BLM, but also leases "some" land from "others." The leases are "mineral leases." We borrow a recitation of the facts extensively from the Decision and Order from the Commission without further attribution.

Taxpayer also owns and operates Buick Mine in Reynolds County, but that mine was not involved in the proceedings before the Commission.

In the course of the assessment cycle for ad valorem taxes on real property on January 1, 2011, Assessor placed a true value in money in the aggregate amount of $143,772,100 on Taxpayer's five parcels of real property at issue before the Commission. The value represented "a close to 30 percent" increase from the value Assessor placed on the real property on January 1, 2009, which, working backwards and using a 30 percent increase, would have been a value of approximately $110,593,923. Taxpayer appealed the January 1, 2011 true value to the Reynolds County Board of Equalization ("BOE"), which "sustained" Assessor's value. Taxpayer then appealed to the Commission. By the time of the hearing before a Hearing Officer with the Commission, Assessor "proposed" an aggregate true value in money for the real property in question of $264,365,599. The Hearing Officer subsequently issued a written decision that affirmed the BOE's determination because "neither party presented substantial and persuasive evidence to rebut the correct valuation by the BOE." Taxpayer requested review of the Hearing Officer's decision by the Commission. The Commission "modifie[d]" the Hearing Officer's decision.

Assessor "classified over 16,000 acres [owned by Taxpayer] as agricultural" and placed a true value in money on those acres of $75 per acre. Assessor classified the remainder of the land owned by Taxpayer as commercial and placed a true value in money on that land of $700 per acre. Taxpayer classified all the land owned by Taxpayer as commercial, and placed a true value in money on that land of $561.88 per acre. Taxpayer also took the position that it owned slightly more land than shown by Assessor (approximately 146 acres more). The Commission's ruling increased the true value in money of Taxpayer's surface land by more than ten million dollars over the true value in money sought by Assessor, and by more than 2.5 million dollars over the true value in money advocated by Taxpayer.

Assessor did not present a value for just the improvements under the "income and sales comparison approach" because those approaches were subsumed within Assessor's unitary income approach for Taxpayer's mines. However, the Commission's determination of the true value in money of the improvements to Taxpayer's land exceeded Assessor's value for at least some of these improvements under a cost approach by more than $3,800,000 dollars, and the Commission's determination included an upward adjustment to Taxpayer's advocated value for the improvements of more than $16,200,000 for the "value [of] the construction work in progress at each mine" that Assessor believed was omitted erroneously from Taxpayer's advocated value for the improvements.
By its terms, the Commission's decision did not ascribe a separate value to "underground improvements" that Assessor asserted had significant value. The Commission likely accepted Taxpayer's argument that these "improvements" did not add any value to the land and simply were holes created in the subsurface terrain in order to access the ore bodies and extract ore with the cost of the holes simply being ordinary and necessary mining expenses (not capital costs), and, to the extent those expenses did add value to the land, likely accepted Taxpayer's appraiser's opinion that the value was included in Taxpayer's income approach to valuing the ore bodies.

Assessor's income approach was to use "the profit from the entire mine unit"-i.e., the "profit[ ] from the sale of concentrates" rather than the royalty income under Taxpayer's mineral leases. Assessor's income approach valued the entire mine-i.e., "the whole ball of wax." Assessor's appraiser believed that Taxpayer's valuation of the ore bodies based on royalty income under Taxpayer's mineral leases and then adding the value of the surface improvements omitted significant value.

The royalty income for the Brushy Creek mine excluded income attributable to the ore extracted from beneath land leased to Taxpayer by BLM. In preparing its "discounted cash flow analysis" for the Brushy Creek mine, Taxpayer utilized "anticipated" aggregate ore for the mine of 1,315,506 tons rather than 17,415,413 tons. The difference between the two figures, after an unrelated adjustment, is the amount of ore extracted from beneath BLM land.

The value of the mineral interest determined by the Commission exceeded Taxpayer's appraised value by slightly more than 25 million dollars.

To the extent Assessor's argument is that the Commission should have taken the profit from the processing and sale of the ore extracted from beneath BLM land into account under the unitary income approach, the Commission specifically rejected Assessor's unitary income approach.