

# Missouri Court of Appeals

## Southern District

### Division Two

MARION TIBBS, ASSESSOR )
BUTLER COUNTY, MISSOURI )
)
    Appellant, )
) No. SD35625
vs. )
)
POPLAR BLUFF ASSOCIATES I, L.P., )
and )
POPLAR BLUFF PROPERTIES III, L.P., )
) **Filed: April 14, 2020**
    Respondents. )

APPEAL FROM THE CIRCUIT COURT OF BUTLER COUNTY

Honorable Judge Michael M. Pritchett

### AFFIRMED

The Butler County Assessor Marion Tibbs and his successor, Chris Rickman ("Assessor"), appeal the trial court's judgment affirming the decision and order of the State Tax Commission ("Commission") establishing the value of two low-income housing properties known as Idlewild Estates and Oak View Apartments ("properties") for certain tax years. In point 1, Assessor alleges the Commission used an impermissible valuation approach based on actual income

and expenses rather than market income and expenses.  In point 2, Assessor contends the Commission's valuation approach creates subclassifications of real property in violation of article X sections 3 and 4(a) and (b) of the Missouri Constitution.  Finding no merit to Assessor's arguments, we affirm the judgment of the trial court.

## Factual and Procedural History

Poplar Bluff Associates I, L.P. ("PB Associates") and Poplar Bluff Properties III L.P. ("PB Properties") (collectively, "Owners") developed two housing complexes whose construction was funded by low-income tax credits. PB Associates built Idlewild Estates, a forty-unit housing complex, in 2005 consisting of an 8.47 acre tract of land improved by a multi-family dwelling with 21 buildings.[1]  PB Properties constructed Oak View Apartments in 1999 consisting of a 3.92 acre tract of land improved by a multi-family dwelling of 48 units.

Both Idlewild Estates and Oak View Apartments are subject to Low Income Housing Tax Credit Land Use Restriction Agreements ("LUR Agreements") made between Owners and the Missouri Housing Development Commission ("MHDC").  MHDC administers the low-income housing tax credit program.  The terms of these LUR Agreements state that restrictive covenants governing "use" and "occupancy" are covenants "running with the land" which bind subsequent owners of the properties for the terms of the agreements.  The

---

[1] The fair market value of Idlewild Estates for tax purposes was the subject of previous litigation in *Tibbs v. Poplar Bluff Associates I, L.P. ("Tibbs 1")*, 411 S.W.3d 814 (Mo. App. S.D. 2013). In *Tibbs 1*, this Court held that neither of the Assessor's points on appeal had been raised before the Commission and therefore Assessor's claims were not preserved for appellate review. *Id.* at 821.

2

properties' LUR Agreements were recorded with the Butler County Recorder of Deeds. For Idlewild, the LUR Agreement dated April 2006 runs for a mandatory compliance period of 15 years, with an additional compliance period of 5 years and an "extended use period" of 30 years. For Oak View, the LUR Agreement dated March 2001 has a mandatory compliance period of fifteen years and an extended low-income use period of fifteen years.

Under the terms of the LUR Agreements, the units shall be rented to qualified low-income tenants. Idlewild may not be sold without the consent of MHDC. Oak View may be sold but the acquisition is "subject to the requirements of this Agreement[.]" Rent for the properties may not be increased without the prior approval of MHDC and is subject to limitations. Owners' failure to comply with the LUR Agreements and other related rules and regulations will permit MHDC to immediately seek recapture of the tax credits previously allocated to the project.

Assessor assessed Idlewild Estates and Oak View Apartments at the following values, which were affirmed by the Butler County Board of Equalization ("BOE") after their respective owners appealed.

| Property | Year | Market Valuation | Assessed Value |
|---|---|---|---|
| Idlewild Estates | 2009 | $2,668,060 | $506,922 |
| Idlewild Estates | 2011 | $3,648,494 | $693,210 |
| Idlewild Estates | 2013 | $3,648,490 | $693,213 |
| Oak View Apartments | 2011 | $2,425,878 | $460,920 |
| Oak View Apartments | 2013 | $2,425,878 | $460,920 |

3

Owners then requested review by the Commission. *See* § 138.430.[2]

An evidentiary hearing on the two properties' five assessed values was held before Hearing Officer John Treu ("Hearing Officer").[3] Four appraisers testified regarding their valuation of the properties. The four appraisers each described how they valued the properties and their consideration of the three main approaches to valuation: the cost approach, the sales comparison approach, and the income approach. The main distinction between the four appraisers was whether or not they conducted their appraisals with consideration of the LUR Agreements covering the properties.

In his testimony at the hearing, Assessor rejected a valuation approach which relied on actual income and expenses. Assessor testified that an owner's decision to enter into a LUR Agreement was a choice the owner made when they decided to own low-income housing, and assessors are to "value the property, not the business of the owner." Assessor testified that, although two appraisers provided appraisals on Assessor's behalf with effective dates of 2009 and 2011 respectively, the values for the 2009, 2011, and 2013 assessments dates would be the same.

*Hearing Officer's Decision*

In June 2016, after a February 2016 evidentiary hearing, the Hearing Officer set aside the BOE's decision, finding Owners had presented substantial

---

[2] All statutory citations are to RSMo. (2016). While some referenced statutes have been amended since 2009, the year of Idlewild's first appraisal, these changes do not affect the analysis herein.
[3] The Hearing Officer consolidated the appeals 09-45500, 11-45500, 11-45501, 13-45502, and 13-45503 for purposes of the evidentiary hearing. Per statute, the assessed values for each odd-numbered year apply in the following even-numbered year, except for new construction and property improvements. § 137.115.1.

4

and persuasive evidence that the true market value of the properties was significantly lower than Assessor's valuations. The Hearing Officer's decision stated that properties funded by low-income tax credits are "unique" in that their "owners have willingly . . . accept[ed] various restrictions, including restricted rents, in exchange for economically desirable benefits." The Hearing Officer determined the "[s]ubject properties herein should be valued using the income approach, utilizing the actual rents and expenses and looking to the market to develop a capitalization rate."[4]

The Hearing Officer established the net operating income for Idlewild Estates for 2008 ($106,241), for 2010 ($83,002), and for 2012 ($85,610). The Hearing Officer established the net operating income for Oak View Apartments for 2010 ($65,413) and for 2012 ($79,954). As for the capitalization rate for both properties, the Hearing Officer chose to use the "market direct capitalization rate" of 7.84%, which was the actual loaded capitalization rate for Oak View Apartments, because it was "consistent within the subsidized housing market and does not exceed the average capitalization rate in the Poplar Bluff Market."[5]

The Hearing Officer entered his decision with the assessed value for each property as follows:

| Appeal # | Parcel # | Tax Year | True Market Value | Assessed Value |
|----------|----------|----------|-------------------|----------------|
| 09-45500 | Idlewild Estates | 1/1/09 | $1,355,115 | $257,471 |
| 11-45501 | Idlewild Estates | 1/1/11 | $1,175,965 | $223,433 |
| 13-45503 | Idlewild Estates | 1/1/13 | $1,091,964 | $207,473 |
| 11-45500 | Oak View Apartments | 1/1/11 | $834,349 | $158,527 |
| 13-45502 | Oak View Apartments | 1/1/13 | $1,019,821 | $193,766 |

[4] This was the same "income-based approach" prescribed by the legislature for valuing subsidized property in the 2015 amendment to section 137.076. The Hearing Officer chose to apply this methodology "irrespective of whether the statute [§ 137.076] existed or not."
[5] A "loaded" capitalization rate has the effective tax rate built in.

5

Under section 138.432, Assessor appealed the Hearing Officer's decision to the Commission challenging the decision as "erroneous as a matter of law" because of the valuation method used, and specifically preserving the argument that the valuation method violated article X sections 3 and 4(a) and (b). The Commission's order, which incorporated the Hearing Officer's decision by reference, affirmed the Hearing Officer's decision.

Assessor then filed an amended petition for review of the Commission's order in Butler County Circuit Court, and the trial court affirmed the Commission. The trial court found the Commission's decision did not violate the Missouri Constitution. This appeal followed.[6]

## Standard of Review

This Court reviews the Commission's decision, not the judgment of the trial court, to determine whether it:

(1) violates constitutional provisions;
(2) exceeds its statutory authority or jurisdiction;
(3) is not supported by competent and substantial evidence on the whole record;
(4) is unauthorized by law for any other reason;
(5) was rendered by means of unlawful procedures or without a fair trial;
(6) is arbitrary, capricious, or unreasonable; or
(7) constitutes an abuse of discretion.

*Armstrong-Trotwood, LLC*, 516 S.W.3d at 835; *see also* § 536.140 and Mo. Const. art. V, § 18. "Notwithstanding, in our mandate, we reverse, affirm or otherwise act upon the judgment of the trial court." *Tibbs 1*, 411 S.W.3d at 819

---

[6] We have jurisdiction over this appeal because the case is not within the exclusive appellate jurisdiction of the Supreme Court of Missouri. *See Armstrong-Trotwood, LLC v. State Tax Comm'n*, 516 S.W.3d 830, 834 (Mo. banc 2017) (holding that a challenge to property assessment not resulting in deposit to state treasury did not involve construction of "revenue laws of the state" requiring exclusive appellate jurisdiction in the Supreme Court of Missouri).

(internal citation and quotation omitted). "This [C]ourt reviews the decision of the Commission and not the hearing officer, unless, as here, the Commission incorporated the decision of the hearing officer, in which case we consider both together[.]" *Id.* at 820. (internal citations, quotations, and brackets omitted).

Our Supreme Court has noted its "hesitan[cy] to substitute its judgment for the [Commission] in matters of property tax assessment[,]" and we defer to the Commission's judgment on factual matters. ***Bateman v. Rinehart***, 391 S.W.3d 441, 445 (Mo. banc 2013). However, to the extent the Commission's decision and order was based on its interpretation and application of the law, this Court will review the Commission's decision *de novo* and correct erroneous interpretations of the law. ***Union Elec. Co. v. Estes***, 534 S.W.3d 352, 365 (Mo. App. W.D. 2017). "While the Commission has some discretion in deciding which approach best estimates the value of a particular property," the Commission's choice of valuation approach "must comply with the law, and once the Commission decides to use a particular approach, it must apply that approach properly and consider all relevant factors." ***Parker v. Doe Run Co.***, 553 S.W.3d 356, 360 (Mo. App. S.D. 2018).

A county BOE's valuation is "presumed correct[,]" but a taxpayer may rebut this presumption by presenting "substantial and persuasive evidence that the valuation is erroneous." ***Id.*** It is the taxpayer's burden to establish the value that should have been placed on the property. ***Id.*** "Determining the true value in money is an issue of fact for the Commission[.]" ***Id.***

7

## Discussion

This case involves the taxation of real property, one of the three classes of property for *ad valorem* tax purposes. *See* Mo. Const. art. X, § 4(a). Real property is further classified by the Missouri Constitution into three subclassifications, including one of "[r]esidential property." Mo. Const. art. X, § 4(a) and (b). Section 137.115 governs real and personal property assessments, and provides: "[t]he assessor shall annually assess all real property . . . at the percent of ***its true value in money***[.]" § 137.115.1 (emphasis added); *see also* § 137.115.5 (real property should be valued at a percentage of its "true value").

"True value in money" means the "price which the property would bring from a willing buyer when offered for sale by a willing seller." ***Cohen v. Bushmeyer***, 251 S.W.3d 345, 348 (Mo. App. E.D. 2008). The true value in money is the fair market value of the property on the property's valuation date, and "is a function of its highest and best use, which is the use of the property which will produce the greatest return in the reasonably near future." ***Snider v. Casino Aztar/Aztar Missouri Gaming Corp.***, 156 S.W.3d 341, 346 (Mo. banc 2005) (internal citation and quotation omitted). True value in money is defined "in terms of value in exchange" not "value in use." ***Equitable Life Assur. Soc. of the U. S./Marriott Hotels, Inc. v. State Tax Comm'n***, 852 S.W.2d 376, 380 (Mo. App. E.D. 1993). True value is "never an absolute figure, but is merely an estimate of the fair market value on the valuation date." ***Drury Chesterfield, Inc. v. Muehlheausler***, 347 S.W.3d 107, 112 (Mo. App. E.D. 2011).

8

In point 1, Assessor argues the Commission erred in its ruling that low-income housing should be valued using an income approach based on actual income and expenses rather than market income and expenses because this valuation method "fails to find the true value of the property as required by the Missouri Constitution," fails to value the "fee simple estate," undervalues the property, and is contrary to the code of state regulations and standard appraisal practice. Because Assessor's constitutional challenges to the Commission's valuation method are included in both of Assessor's points but are specifically identified in point 2, we will address the constitutional issues as part of our point 2 analysis.

For property tax purposes, real property is generally valued using "one or more of three generally accepted approaches." ***Snider***, 156 S.W.3d at 346. These three approaches include the cost approach, the comparable sales approach, and the income approach (also known as income capitalization). ***Id.*** at 346-48; ***Missouri Baptist Children's Home v. State Tax Comm'n*** ("***MBCH***"), 867 S.W.2d 510, 511 n.3 (Mo. banc 1993). The cost approach is based on "either reproduction cost or replacement cost." ***Snider***, 156 S.W.3d at 347. The comparable sales approach applies "prices paid for similar properties in arms-length transactions and adjusts those prices to account for differences between the properties." ***Id.*** at 347-48. The income approach to valuation "determines value by estimating the present worth of what an owner will likely receive in the future as income from the property." ***Id.*** at 347. This approach considers what a buyer would be willing to pay to realize the income stream

obtainable "from the property when devoted to its highest and best use." ***Id.***
(quoting ***Equitable Life***, 852 S.W.2d at 380).

> Each valuation approach is applied with reference to a specific use
> of the property – its highest and best use. The method used
> depends on several variables inherent in the highest and best use of
> the property in question. Each method uses its own unique factors
> to calculate the property's true value in money.

***Id.*** at 346-47 (internal citations omitted); *see **Union Elec. Co.***, 534 S.W.3d at 366. Use of a particular valuation approach may be more appropriate in some circumstances than others. For example, use of the comparable sales approach is "most appropriate when there is an active market for the type of property at issue" and there is "sufficient data [] available to make a comparative analysis." ***Snider***, 156 S.W.3d at 348. Conversely, when there is an "absence of comparables in the market," the comparable sales approach should be rejected. ***Id.*** at 350.

"It is within the purview of the hearing officer to determine the method of valuation to be adopted in a given case." ***Drury***, 347 S.W.3d at 112. The Commission has some discretion when deciding "which approach best estimates the value of a particular property[,]" but its choice of a valuation approach must comply with the law that "real property in Missouri be taxed according to its true value in money." ***Snider***, 156 S.W.3d at 348. Here, the Commission heard evidence from four different appraisers who used a combination of approaches to value the properties, but who all relied heavily on the income approach.

*Assessor's Appraisals*

On behalf of Assessor, John Karnes ("Karnes") prepared an appraisal of Idlewild Estates effective January 1, 2009 using the cost approach and the

10

income approach to valuation. For his income approach, to which he gave more weight, Karnes compared the property with "similar rented facilities" with similar physical characteristics and location characteristics. Karnes considered the highest and best use of the property to be multi-unit residential. The key aspect of Karnes' appraisal was that he evaluated the owner's property rights as an "owner of the *fee simple* title to subject property, under the *hypothetical condition* that no government contracts are in place." (emphasis in original). Applying a 7.15% capitalization rate under his income approach, Karnes' valuation for Idlewild Estates was $3,468,000 and this was also his final valuation.[7]

Randy Rahlmann ("Rahlmann") provided an appraisal of Oak View Apartments for Assessor as of January 1, 2011 where he utilized all three approaches to valuation, but gave the most weight to the income approach since these are "income producing property." Like Karnes, Rahlmann did not consider the deed restrictions associated with the property. In developing his income approach, Rahlmann looked to the rents on four comparable properties. He chose to use actual rents as market rents after considering that "the subject units are newer" and contain more bedrooms and bathrooms than the comparable properties. Rahlmann chose to use current interest rates for a mortgage and "an acceptable equity dividend rate" to arrive at his overall capitalization rate, once the tax rate factor was added in, of 10%. Based on the income approach and sales

---

[7] Capitalization is the "process of converting a net income stream into an indication of value." A capitalization rate is a combination of: "(1) the effective tax rate, (2) the interest mortgage rate and (3) the equity rate." *Lebanon Props. I v. North*, 66 S.W.3d 765, 769 (Mo. App. S.D. 2002).

comparison approaches, Rahlmann determined the Oak View property value on January 1, 2011 was $2,000,000.

*Owners' Appraisals*

On behalf of PB Associates, Troy Smith ("Smith") provided valuations of Idlewild Estates for the years 2009, 2011, and 2013, using the income approach and the cost approach. Smith also stated that to make his appraisal compliant with the Uniform Standards of Appraisal Practice ("USPAP"), he needed to value the property "with that deed restriction in place." Smith primarily relied on the income approach, using the current low-income housing tax credit rents established by MHDC.[8] Using a capitalization rate adjusted for taxes of 8.81%, Smith concluded the true value in money of the fee simple estate was $1,020,000 for 2009. This true value in money was raised to $1,030,000 for 2011 and $1,060,000 for 2013.

Kenneth Jaggers ("Jaggers") appraised Oak View Apartments on behalf of PB Properties for the effective dates of January 1, 2011 and January 1, 2013 and he used a sales comparison approach and income capitalization approach.[9] For his income approach, Jaggers used the direct capitalization method to convert anticipated net income into an indication of value and compared the market rent of other rent-restricted properties. Jaggers' report concluded that the value for

---

[8] Smith stated the sales comparison approach was potentially misleading because properties subject to LUR Agreements rarely sell due to their rent-restricted income.

[9] Jaggers calculated the restricted rents were "approximately 49% of cost feasible rents." However, since the "sales transactions cannot be accurately adjusted to reflect all of the economic elements of abandoning the [LUR Agreement,]" Jaggers gave the sales comparison approach only "ancillary consideration."

the property as of January 1, 2011 was $670,000 and as of January 1, 2013 was $970,000.

Thus, all four appraisers utilized the income approach to valuation while also considering one or more other approaches to valuation. In its decision, the Commission used the income method of valuation to determine the value of the properties. The Commission rejected the other approaches to valuation because "subsidized properties do not tend to sell and costs tend to be inflated, making sales and cost approaches difficult." Because the income approach is the approach "most appropriate" when valuing "investment-type properties[,]" *Snider*, 156 S.W.3d at 347, it was within the Commission's sound discretion to use the income approach to determine the true value of the properties. *See Union Elec. Co*., 534 S.W.3d at 367. However, when the Commission decides to use a particular approach, the Commission "must apply that approach properly and consider all of the factors relevant to that approach." *Snider*, 156 S.W.3d at 348.

In *MBCH*, the Supreme Court of Missouri considered the value of a below-market lease on the Commission's assessment of the "true value in money" of a piece of commercial property in an application of the income capitalization valuation method. 867 S.W.2d at 512. Our Supreme Court concluded the "better-reasoned approach is to authorize the assessing authority to utilize *actual* as well as potential income in determining true value." *Id.* The Court favorably considered cases that took a "realistic approach" to economic conditions which cause the property to have "lower actual rentals" than could be obtained if the property was unencumbered by the lease. *Id.* at 512-13. The fact

13

that "prudent potential buyers would take the lease into consideration in determining what they are willing to pay are economic factors weighing in favor of giving consideration to actual rentals rather than relying solely on hypothetical value." *Id.* at 513. The Court stated "consideration of potential rent hypothesizes an unrealistic market[]" and "[w]holly excluding below-market long-term leases from the equation assumes facts that do not and are unlikely ever to exist." *Id.* However, our Supreme Court noted that circumstances may exist where "projected actual income may be adjusted to reflect current market conditions where actual rent substantially distorts the property's true value[,][10] and there may be circumstances where "the income capitalization method is too vague or speculative to be a reliable measure of value." *Id.*

*MBCH* was analyzed in *Maryville Properties, L.P. v. Nelson*, where the court considered whether the Commission could rely on the value of low-income housing tax credits as part of its valuation of a rent-restricted apartment complex. 83 S.W.3d 608, 617 (Mo. App. W.D. 2002). The court rejected the consideration of these tax credits because they were "intangible property." *Id.* As part of its analysis, the court contrasted the value of low-income housing tax credits with characteristics of property that have a direct effect on its income, such as "[b]elow market leases and tax abatements[.]" *Id.* at 616.

Here, the Commission's choice to consider the actual income and expenses of the properties when applying the income valuation methodology was consistent with our Supreme Court's holding in *MBCH*. Similar to the long-term

---

[10] *See* ***Nance v. State Tax Comm'n***, 18 S.W.3d 611, 620 (Mo. App. W.D. 2000) for an example of a case where the court found that the actual income received under a lease "substantially distorted [a] leasehold's true value."

14

lease in **MBCH**, Idlewild Estates and Oak View Apartments are both covered by LUR Agreements. These LUR Agreements restrict the income the properties can produce by restricting the amounts Owners can charge for rent. Even Assessor's appraiser, Rahlmann, noted that a well-informed buyer would consider the existence of deed restrictions associated with a property when making a decision on whether to buy the property. To calculate the value of the properties without considering the restrictions imposed by virtue of the LUR Agreements would "hypothesize[] an unrealistic market" and assume facts that do not exist. **MBCH**, 867 S.W.2d at 513.

The true value in money of real property "is the fair market value of the property on the valuation date, and is a function of its highest and best use, which is the use of the property which will produce ***the greatest return in the reasonably near future***." **Snider**, 156 S.W.3d at 346 (emphasis added) (quoting **Aspenhof Corp. v. State Tax Comm'n**, 789 S.W.2d 867, 869 (Mo. App. E.D. 1990)). "Property should be valued according to the use that is readily available." **Peruque, LLC v. Shipman,** 352 S.W.3d 370, 376 (Mo. App. E.D. 2011). The properties' actual income and expenses do not serve to distort the properties' true value, *see* **MBCH**, 867 S.W.2d at 513, but rather reflect the only use of the properties that is readily available in the reasonably near future: as low-income housing subject to rent-restricted income.

In this case, the restrictions placed on the property by the LUR Agreements limit the income the property can produce by limiting the rent that can be charged and mandating that rent increases can only be made subject to MHDC approval. Unlike tax credits, which have "no direct contribution to the

market value" of a subsidized housing development, "below market leases" have a direct effect on the income of the property. *Maryville*, 83 S.W.3d at 617. The properties' restrictions found in the LUR Agreements "run with the land" and remain in place to bind subsequent owners of the properties. Accordingly, the Commission's decision to consider the actual income and expenses of the properties when determining the properties' true value in money was in accordance with our Supreme Court's decision in *MBCH* and was not erroneous as a matter of law.[11]

Assessor also argues the Commission must value the properties at their "highest and best use," citing *Snider*, and argues the highest and best use of an apartment is the rent the apartment could generate with no LUR Agreement. However, this argument ignores our Supreme Court's reasoning in *MBCH* which stated that the "better-reasoned approach" was to use actual and potential income in determining true value. 867 S.W.2d at 512. As the Court in *MBCH* observed, a long-term lease often "gives value to the property," and "prudent potential buyers would take the lease into consideration in determining what they are willing to pay[,]" which weighs in favor of considering actual rentals rather than "relying solely on hypothetical value." *Id.* at 513. Here, Rahlmann acknowledged that the highest and best use of property must fit the criteria of being "physically possible, legally permissible, financially practical, and

_____

[11] Faring no better are Assessor's other theories of error as a matter of law in considering actual income and expenses. Rather than detailing other, individualized reasons each such claim fails, we simply note that these complaints, individually and collectively, are no more than indirect challenges to the propriety of the Commission's subsidized-housing methodology itself. Because we otherwise uphold this methodology *supra* and *infra*, we cannot find the Commission erred as a matter of law in applying it.

maximally productive."  Karnes acknowledged his appraisal was not based on "actual realities," but was hypothetical.  The Commission reasonably applied the income valuation approach using the properties' actual income and expenses under the restrictions imposed by the LUR Agreements because this was the legally permissible use of the property a potential buyer would consider, and not a hypothetical value assuming no LUR Agreements existed.  *Cf.* § 137.076.2.

The Commission's choice and application of the income approach to valuing the properties was both reasonable and lawful.  Assessor's point 1 is denied.

*Point 2*

In point 2, Assessor argues the Commission erred in using a valuation method that treats low-income housing as "unique" and gives it favorable treatment for tax purposes because this results in an impermissible subclassification of residential real property in violation of article X sections 3 and 4(a) and (b) of the Missouri Constitution and "results in an unlawful partial exemption from property taxes" for low-income housing.  Assessor alleges that the Commission's valuation method violates the requirement that "all taxes be uniform" (found in art. X, § 3), and that the Constitution prohibits residential real property from further subclassification.[12]

Missouri's Constitution provides:

_____

[12] Assessor also argues in their brief that § 137.076 is unconstitutional and states "[i]t would be in the interest of judicial economy" for this Court to make such a finding.  Such a finding would be premature and inappropriate because neither the Hearing Officer, nor the Commission, nor the trial court relied on section 137.076 when upholding the Commission's decision.  The trial court specifically stated that Assessor's "assertion that § 137.076 RSMo. 2015[] violates the Missouri [C]onstitution is not an issue before this court."  We decline to rule on the constitutionality of § 137.076 in this case.

Taxes may be levied and collected for public purposes only, ***and shall be uniform upon the same class or subclass of subjects within the territorial limits of the authority levying the tax***. All taxes shall be levied and collected by general laws and shall be payable during the fiscal or calendar year in which the property is assessed. Except as otherwise provided in this constitution, the methods of determining the value of property for taxation shall be fixed by law.

Mo. Const. art. X, § 3 (emphasis added).

All taxable property shall be classified for tax purposes as follows: ***class 1, real property***; class 2, tangible personal property; class 3, intangible personal property. ***The general assembly, by general law, may provide for further classification within classes 2 and 3, based solely on the nature and characteristics of the property, and not on the nature, residence or business of the owner, or the amount owned.*** . . .

Mo. Const. art. X, § 4(a) (emphasis added).

Property in classes 1 and 2 and subclasses of those classes, shall be assessed for tax purposes at its value or such percentage of its value as may be fixed by law for each class and for each subclass.

. . . .

Property in class 1 shall be subclassed in the following classifications:

***(1) Residential property***;

(2) Agricultural and horticultural property;

(3) Utility, industrial, commercial, railroad, and all other property not included in subclasses (1) and (2) of class 1. ***Property in the subclasses of class 1 may be defined by law, however subclasses (1), (2), and (3) shall not be further divided,*** provided, land in subclass (2) may by general law be assessed for tax purposes on its productive capability. The same percentage of value shall be applied to all properties within any subclass. No classes or subclass shall have a percentage of its true value in money in excess of thirty-three and one-third percent.

18

Mo. Const. art. X, § 4(b) (emphasis added).[13]

In ***MBCH***, our Supreme Court considered whether an assessment which factored in the below-market lease's effect on the valuation of the property violated article X section 3 of the Missouri Constitution. 867 S.W.2d at 513. The Supreme Court rejected that argument, stating "[m]erely because a factor exists which impacts on the value of one piece of property that does not affect every other piece of property in the same class is not a basis for violation of the uniformity clause." ***Id.*** The Court found "no error was committed in considering the actual rent as a factor." ***Id.***

In ***Snider***, the Court held that a different constitutional provision, article X section 4(b), was violated when one type of commercial property was valued "based on something less than its highest and best use while all other commercial property is valued at its highest and best use." 156 S.W.3d at 348. By valuing a casino at its "next best use," the Commission created an impermissible "valuation subclass of commercial property." ***Id.*** at 349. Assessor relies on ***Snider*** to argue the Commission's valuation method creates an impermissible subclass of residential real property in violation of article X sections 3 and 4(b) by treating low-income housing differently than other apartments and rental housing.

However, ***Snider*** is distinguishable from this case for at least three reasons. First, in ***Snider***, our Supreme Court focused on the Commission's *choice* of valuation method and not on the *application* of the proper valuation

---

[13] The subclassification of real property in article X section 4(b) resulted from a 1982 constitutional amendment. *See **Assoc. Indus. of Mo. v. State Tax Comm'n.**, 722 S.W.2d 916, 919 (Mo. banc 1987).

19

method. *See id.* at 350 (noting the Commission "ignored evidence" that "the reproduction cost approach," and not the income approach "would most accurately indicate the true value in money" of the casino). Here, the Commission applied the income valuation method which was in accord with the method all four appraisers placed the most reliance on. Second, in ***Snider***, the possession of a gaming license was necessary to operate the property as a casino, and this license was not tied to the property itself. *Id.* at 349. The casino licensee could move the operation to another location, which could then be used for another purpose. The LUR Agreements are different because they are location-based, instead of license-based.

Most importantly, consideration of the properties' actual rent and expenses under the LUR Agreements does not impermissibly value the properties at "less than [their] highest and best use" as compared to other residential properties. *Id.* Assessor's appraiser Rahlmann agreed that the highest and best use of the property in its existing use was with the property's "existing limitations[.]" Jaggers testified he included the LUR Agreements as part of his appraisal because they were "a matter of fact, and the property as it exists as of the effective date." To value the properties as multi-family housing subject to market rent assumes a hypothetical condition which does not exist, *see **MBCH***, 867 S.W.2d at 513, and is not the same as valuing a casino at its "alternate second-best use" as a country club. ***Snider***, 156 S.W.3d at 348-49.

The constitutional challenge presented in this case is more like the one faced by our Supreme Court in ***MBCH*** and dissimilar to the one faced by the Court in ***Snider***. The property valuation upheld in ***MBCH*** factored in the

20

effects of the below market long-term lease, which necessarily reduced the value of this particular property as compared to others in the same classification of commercial property, yet, this valuation was not deemed to violate article X section 3 of the Missouri Constitution. 867 S.W.2d at 513. We conclude the Commission's application of the income valuation method using actual rents and expenses did not create an impermissible subclassification of residential property in violation of article X section 3 or 4(a) or (b) of the Missouri Constitution. Point 2 is denied.

## Conclusion

The judgment of the trial court affirming the Commission's order is affirmed.

MARY W. SHEFFIELD, J. – OPINION AUTHOR

JEFFREY W. BATES, J. – CONCURS

DANIEL E. SCOTT, J. – CONCURS IN RESULT IN SEPARATE OPINION


MARION TIBBS, ASSESSOR )
BUTLER COUNTY, MISSOURI )
         )
    Appellant, )
         )  No. SD35625
v. )
         )
POPLAR BLUFF ASSOCIATES I, L.P., and )
POPLAR BLUFF PROPERTIES III, L.P., )
         )
    Respondents. )

### OPINION CONCURRING IN RESULT

The principal opinion's extensive factual and legal background tends to mask the central issue: Does Assessor convince us that the Commission's subsidized-housing assessment methodology since 2004, and codified in 2015 as § 137.076.2, is unconstitutional?[1] Assessor failed to preserve such claims in **Tibbs**

---

[1] We quote § 137.076.2:

> In establishing the value of a parcel of real property, the county assessor shall use an income-based approach for assessment of parcels of real property with federal or state imposed restrictions in regard to rent limitations, operations requirements, or any other restrictions imposed upon the property in connection with:
>
> > (1) The property being eligible for any income tax credits under Section 42 of the Internal Revenue Code of 1986, as amended;
> >
> > (2) Property constructed with the use of the United States Department of Housing and Urban Development HOME investment partnerships program;
> >
> > (3) Property constructed with the use of incentives provided by the United States Department of Agriculture Rural Development; or
> >
> > (4) Property receiving any other state or federal subsidies provided with respect to use of the property for housing purposes.

*1*[2] and, as next seen, briefing violations significantly hamper appellate review this time.

As the principal opinion notes, § 536.140 recognizes seven potential judicial challenges to administrative action. Assessor's critical failing, as appellant, stems from his belief that he can compress and simultaneously assert all seven grounds in a single Rule 84.04 point or argument. Appellate courts have decried similar efforts where, as here, each ground for challenge is a separate legal claim proved differently from other grounds and subject to different principles and procedures of appellate review. *See, e.g.,* ***Smith v. Great Am. Assur. Co.***, 436 S.W.3d 700, 703-04 (Mo.App. 2014). The difficulties presented by Assessor's approach here, with seven grounds for review, greatly exceed those in ***Smith*** where only three grounds were involved. Moreover, per Rule 84.04(d) and cases following, the only authorized challenges presented by Assessor's points are article X, § 3, 4(a), and 4(b) constitutional complaints. I would consider only those, but not Assessor's non-constitutional arguments for fear that effectively-dicta statements may be misconstrued by future litigants.

### Unconstitutionality Complaints

*Article X, Section 3*

Like the court, I find this claim unpersuasive in light of ***MBCH***.

*Article X, Section 4(a)*

Assessor urges "in particular" that the subsidized-housing methodology "fails to determine the true value in money of the property and fails to value the

---

For the purposes of this subsection, the term "**income-based approach**" shall include the use of direct capitalization methodology and computed by dividing the net operating income of the parcel of property by an appropriate capitalization rate not to exceed the average of the current market data available in the county of said parcel of property. Federal and state tax credits or other subsidies shall not be used when calculating the capitalization rate. Upon expiration of a land use restriction agreement, such parcel of property shall no longer be subject to this subsection.

*See also* ***Tibbs 1***, 411 S.W.3d at 817-19 & n.6; ***Maryville Properties, L.P. v. Nelson***, 2000 WL 509484 (Mo. State Tax Comm'n Apr. 27, 2000), as modified by ***Maryville Properties, L.P. v. Nelson***, 83 S.W.3d 608 (Mo.App. 2002), and discussed in ***Lake Ozark Village v. Whitworth***, 2004 WL 1172803 (Mo. State Tax Comm'n Apr. 29, 2004)("In this case, and all subsequent subsidized housing cases, the correct methodology for valuing subsidized housing projects is the methodology set out in *Maryville Properties*," *id*. at *8).

2 *See* 411 S.W.3d at 820-21. As in footnote 1, I freely short cite cases fully cited in the principal opinion.

property based 'on the nature and characteristics of the property and not on the … business on the owner…' Article X Section 4(a)."

This assertion has two fatal flaws. First, as **Associated Industries** notes, Assessor is quoting a constitutional provision for personal, not real, property. 722 S.W.2d at 919; *see also* **id**. at 921-22 (Robertson, J., concurring). Second, the "true value in money" concept is primarily statutory (§ 137.115), not constitutional, and thus offers little or no support for Assessor's constitutional challenge.[3]

*Article X, Section 4(b)*

This is the most difficult claim. Assessor earnestly charges that a special methodology limited to subsidized housing, which necessarily if not purposefully reduces those tax values, *de facto* sub-classifies those residential properties in violation of article X, § 4(b). Yet I am persuaded in this close case to follow the lead of another close § 4(b) case, **Associated Industries**.

**Associated Industries** considered whether a statutory definition then limiting § 4(b) "residential property" to structures of four or fewer dwelling units established a subclass contrary to § 4(b). While not perfectly analogous to our case, that claim seems as strong if not stronger than Assessor's claim here. Our high court upheld the statute by the slimmest of margins over three vigorous dissenting opinions. I think principles that carried the day for that statute also do so here (perhaps by an equally narrow margin) despite any differences between the cases or claims.

For one thing, as repeatedly noted, our legislature in 2015 raised the subject methodology to statutory status. "Statutes are presumed to be constitutional until the contrary is shown. Every indulgence must be made in favor of the legislature's handiwork." **Associated Industries**, 722 S.W.2d at 918. "Perfect equity in the assessment of real property cannot be expected." **Id**. at 919. Ultimately, like **Associated Industries**' majority, I conclude "that the challenges have failed to overcome the presumption of constitutionality." **Id**. at 917. Our general assembly,

---

[3] Section 4(b), not 4(a), does provide that "[n]o classes or subclass shall have a percentage of its true value in money in excess of thirty-three and one-third percent." But since Assessor claims the subject properties are being undertaxed, not overtaxed, this "true value in money" reference does not aid him.

armed with superior means of information about public impact of its actions, legislatively confirmed this methodology. Assessor has not convinced me that the legislature exceeded its constitutional authority in doing so or that its action was otherwise constitutionally infirm. *Id*. at 919.

For these reasons, I would reach the same outcome as the principal opinion, so I concur in the result.

DANIEL E. SCOTT, J. — SEPARATE OPINION AUTHOR